IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORUS BANK, N.A.,               )
                               )
                Plaintiff,      )
                               )        Case No.  08 C 3409
        v.                      )
                               )
EDUARD de GUARDIOLA,            )        Hon. Wayne R. Andersen
                               )
                Defendant.      )        Magistrate Judge Michael T. Mason
                               )

## NOTICE OF FILING

TO:   Monica J Mosby
      Monica.Mosby@kattenlaw.com
      Timothy J. Patenode
      timothy.patenode@kattenlaw.com
      Katten Muchin Rosenman LLP
      525 West Monroe Street
      Chicago, IL 60661
      312-902-5382
      *Counsel for Corus Bank, N.A.*

**FILED**
AUG 27 2008 TC
Aug 27, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**PLEASE TAKE NOTICE** that on August 27, 2008, the undersigned caused to be filed with the Clerk of the U.S. District Court, Northern District of Illinois of Eastern Division, paper copies of **Exhibits A2-4, D1, D2** of Motion To Abstain Under The *Colorado River* Doctrine, previously filed electronically, as requested by the Docket Clerk.

Respectfully submitted,

E. King Poor
Donald R. Cassling                    /s/ Steven V. Hunter
Steven V. Hunter
QUARLES & BRADY LLP
500 West Madison Street, Suite 3700
Chicago, Illinois 60661
(312) 715-5000



**Exhibit A-2**
**4 of 4**

30.   Any rights, interests or claims arising from the following matters shown on survey prepared by Cumbey & Fair, Inc., dated October 4, 2003, last revised July 15, 2005, under Job. No. 578B:

  • Encroachments of parking areas and curbing over and across the easements running throughout the property.

  • Encroachment of pond over and across the southwest portion of the property onto adjacent land. (Sheet 1 corner of Pine Ridge Boulevard/Commercial Drive.)

31.   Special Purpose Utility Easement recorded in Official Records Book 9870, Page 1571 of the Public Records Pinellas Florida. (Parcel 2, Phase 1)

## EXHIBIT C

### Title Requirements

1.  Title Insurance Company Requirements. The maximum single risk (i.e., the amount insured under any one policy) by a title insurer may not exceed 25% of that insurer's surplus and statutory reserves. Reinsurance must be obtained by closing for any policy exceeding such amount.

2.  Loan Policy Forms. Standard 1992 American Land Title Association ("ALTA") form of loan title insurance policy, or the 1970 (amended October 17, 1970) ALTA loan form policies must be used.

3.  Insurance Amount. The amount insured must equal at least the original principal amount of the Loan.

4.  Named Insured. The named insured under the Title Policy must be substantially the same as the following: "Corus Bank, N.A. and its respective successors and assigns."

5.  Creditors' Rights. Any "creditors' rights" exception or other exclusion from coverage for voidable transactions under bankruptcy, fraudulent conveyance, or other debtor protection laws or equitable principles must be removed by either an endorsement or a written waiver or issuance of a 1970 Form Policy with 1982 modifications.

6.  Arbitration. In the event that the form policy which is utilized includes a compulsory arbitration provision, the insurer must agree, if permitted by law, that such compulsory arbitration provisions do not apply to any claims by or on behalf of the insured. Please note that the 1987 and 1992 ALTA form loan policies include such provisions.

7.  Date of Policy. The effective date of the Title Policy must be as of the date and time of the closing.

8.  Legal Description. The legal description of the property contained in the Title Policy must conform to (a) the legal description shown on the survey of the property, and (b) the legal description contained in the Mortgage. In any event, the Title Policy must be endorsed to provide that the insured legal description is the same as that shown on the survey.

9.  Easements. Each Title Policy shall insure, as separate parcels: (a) all appurtenant easements and other estates benefiting the property, and (b) all other rights, title, and interests of the borrower in real property under reciprocal easement agreements, access agreements, operating agreements, and agreements containing covenants, conditions, and restrictions relating to the Project.

10. Exceptions to Coverage. With respect to the exceptions, the following applies:

    a)  Each Title Policy shall afford the broadest coverage available in the state in which the subject property is located.

C-i

b)     The "standard" exceptions (such as for parties in possession or other matters not shown on public records) must be deleted.

c)     The "standard" exception regarding tenants in possession under residential leases, should also be deleted.  For commercial properties, a rent roll should be attached in lieu of the general exception.

d)     The standard survey exception to the Title Policy must be deleted. Instead, a survey reading reflecting the current survey should be incorporated.

e)     Any exception for taxes, assessments, or other lienable items must expressly insure that such taxes, assessments, or other items are not yet due and payable.

f)     Any lien, encumbrance, condition, restriction, or easement of record must be listed in the Title Policy, and, if permitted by law, the Title Policy must affirmatively insure that the improvements do not encroach upon the insured easements or insure against all loss or damage due to such encroachment.

g)     The Title Policy may not contain any exception for any filed or unfiled mechanic's or materialmen's liens.

h)     In the event that a comprehensive endorsement has been issued and any Schedule B exceptions continue to be excluded from the coverage provided through that endorsement, then a determination must be made whether such exceptions would be acceptable to Lender.  In the event that it is determined that such exception is acceptable, a written explanation regarding the acceptability must be submitted as part of the delivery of the loan documents.

If Schedule B indicates the presence of any easements that are not located on the survey, the Title Policy, if permitted by law, must provide affirmative insurance against any loss resulting from the exercise by the holder of such easement of its right to use or maintain that easement. ALTA Form 103.1 or an equivalent endorsement is required for this purpose.

11.     Endorsements.  With respect to endorsements, the following applies:

a)     Each Title Policy must include an acceptable environmental protection lien endorsement on ALTA Form 8.1.  Please note that Form 8.1 may take exception for an entire statute which contains one or more specific sections under which environmental protection liens could take priority over the Mortgage, provided, however, that such specific sections under which the lien could arise must also be referenced.

b)     Each Title Policy must contain an endorsement which provides that the insured legal description is the same as shown on the survey.

c) Each Title Policy must contain a comprehensive endorsement (ALTA Form 9) if a lien, encumbrance, condition, restriction, or easement is listed in Schedule B to the title insurance policy.

d) Lender may require the following endorsements where applicable and available:

| | | |
|---|---|---|
| -access | -due execution | -single tax lot |
| -address | -first loss | -subdivision |
| -adjustable rate | -last dollar | -tie in |
| -assessments | -leasehold | -usury |
| -assignment of leases and rents | -mineral rights | -zoning (ALTA 3.1 |
| -assignment of loan documents | -mortgage tax | -with parking) |
| -condominium endorsement | -reverter | |
| -contiguity | -revolving credit | |
| -doing business | | |

12. Other Coverages. If permitted by applicable law, each Title Policy shall insure the following by endorsement or affirmative insurance to the extent such coverage is not afforded by the ALTA Form 9 or its equivalent in a particular jurisdiction:

a) that no conditions, covenants, or restrictions of record affecting the property:

(i) have been violated;
(ii) create lien rights which prime the insured mortgage,
(iii) contain a right of reverter or forfeiture, a right of reentry, or power of termination, or
(iv) if violated in the future would result in the lien created by the insured mortgage or title to the property being lost, forfeited, or subordinated; and

b) that except for temporary interference resulting solely from maintenance, repair, replacement, or alteration of lines, facilities, or equipment located in easements and rights of way taken as certain exceptions to each Title Policy, such exceptions do not and shall not prevent the use and operation of the Project or the improvements as used and operated on the effective date of the Title Policy.

13. Informational Matters. The Policy must include, as an informational note, the following:

a) The recorded plat number together with recording information; and

b) The property parcel number or the tax identification number, as applicable.

14. <u>Delivery of Copies</u>.  Legible copies of all easements, encumbrances, or other restrictions shown as exceptions on the Title Policy must be delivered with the first draft of the title commitment.

**EXHIBIT D**

Form of Survey Certification

**CERTIFICATION FOR SURVEYS (LONG-FORM)**

I hereby certify to CORUS Bank, N.A., its successors and assigns, and _____ (insert Borrower and Title Insurance Company) that the survey prepared by me entitled "_____" was actually made upon the ground and that it and the information, courses and distances shown thereon are correct; that the title lines and lines of actual possession are the same; that the size, location and type of buildings and improvements are as shown and all are within the boundary lines of the property; that there are no violations of zoning ordinances, restrictions or other rules and regulations with reference to the location of said building and improvements; that there are no easements, encroachments or use affecting this property appearing from a careful physical inspection of the same, other than those shown and depicted thereon; that all utility services required for the operations of the premises either enter the premises through adjoining public streets, or the survey shows the point of entry and location of any utilities which pass through or are located on adjoining private land; that the survey shows the location and direction of all storm drainage systems for the collection and disposal of all roof and surface drainage; that any discharge into streams, rivers or other conveyance system is shown on the survey; and that the parcels described hereon do not lie within [or lie within] flood hazard areas in accordance with the document entitled "Department of Housing and Urban Development, Federal Insurance Administration–Special Flood Hazard Area Maps." This survey is made in accordance with the "Minimum Standard Detail Requirements for Land Title Surveys" jointly established and adopted by ALTA and ACSM in 1999 for Class A Urban Survey and includes items 1-4, 6-7(b)(i), 8-10, 11(b) and 13 of Table A. Pursuant to the Accuracy Standards as adopted by ALTA, NSPS, and ACSM and in effect on the date of this certification, the undersigned further certifies that: [Surveyor to complete with appropriate choice from Minimum Standard Detail Requirement]

**EXHIBIT E**

## NON-CONSTRUCTION
## INSURANCE REQUIREMENTS

I.    <u>Insurance</u>. Borrower shall obtain, and maintain at all times during term of the Loan, such insurance as Corus Bank, N.A. ("Lender") may reasonably require, including, but not limited to the insurance coverage set forth below. Unless otherwise expressly defined herein, capitalized terms set forth in this Exhibit are terms of art, as used in and understood in the insurance industry or are defined terms in the Application or Commitment Letter.

(a)    <u>Casualty</u>. Borrower shall maintain or obtain insurance against loss customarily included under standard "All Risk" policies including Flood, Earthquake, and such other insurable hazards as, under good insurance practices are insured against for other property and buildings similar to the premises in nature, use, location, height, and type of construction. The amount of such insurance shall be not less than one hundred percent (100%) of the replacement cost of the improvements to the Project. Such insurance policy shall contain an agreed amount endorsement. Flood and Earthquake sublimits shall be at least 25% of the replacement cost, but not less than $5,000,000 each per occurrence and in the annual aggregate, unless the risk is located in a Mercalli Zone VII or greater or a Flood Zone "A", as defined by the National Insurance Flood Plan. If the Project is located in an Earthquake Mercalli Zone VII or greater Borrower shall maintain Earthquake limits providing for 75% of the replacement cost, with a deductible not greater than 5% of the replacement cost. If the Project is located in a Flood Zone "A", Borrower shall maintain Flood limits providing for 20% of the replacement cost, with a deductible not greater than 3% of replacement costs. Such insurance policy shall cover increased cost of law or ordinance insurance, costs of demolition and increased cost of construction with a sublimit of not less than $1,000,000. If coverage is provided under a blanket policy, Lender shall be named as sole Loss Payee and Mortgagee for the Project.

(b)    <u>Boiler</u>. Comprehensive Broad Form Boiler and Machinery Insurance in the minimum amount of $10,000,000 covering all mechanical and electrical equipment against physical damage and covering, without limitation, all tenant improvements and betterments that Borrower is required to insure pursuant to any lease on a replacement cost basis. Such insurance shall provide coverage against loss or damage from an accident to and/or caused by boilers and machinery, including but not limited to: heating apparatus, pressure vessels, pressure pipes, and electrical or air conditioning equipment on a blanket comprehensive coverage form, in such amount as Lender shall reasonably approve. All exclusions for testing shall be removed. Coverage shall be extended to include loss of rental income for 6 months as a result of damage from an insured peril.

(c)    <u>Commercial General Liability</u>. Commercial General Liability insurance, including, but not limited, Owned (if any), Hired and Non Owned Auto Liability, and Umbrella Liability coverage for Personal Injury, Bodily Injury, Death, Accident and Project Damage, providing in combination no less than $10,000,000 per occurrence and in the annual aggregate, <u>per location</u>. The policies described in this paragraph shall

E-i

cover, without limitation: elevators, escalators, independent contractors, contractual liability and Products and Completed Operations Liability coverage.

    (d)    <u>Worker's Compensation</u>. If applicable, worker's compensation insurance covering Borrower and its employees at the site to the extent required, and in the amounts required by applicable Laws.

    (e)    <u>Employer's Liability</u>.  If applicable, in the amount of $1,000,000 per accident, $1,000,000 per illness, per employee and $1,000,000 per illness, in the aggregate.

    (f)    <u>Business Interruption</u>. Upon Lender's reasonable request, business income and extra expense, against the perils insured by the Casualty Insurance, for a period of indemnity of twelve months

    (g)    <u>Dram Shop</u>.  Upon Lender's reasonable request or prior to any tenant selling alcoholic beverages on any part of the Project, Borrower either itself or through the Tenant shall provide evidence of so-called "Dram Shop" against claims or liabilities arising directly or indirectly to Persons or property on account of the sale or dispensing of alcoholic beverages. Coverage shall include loss of means of support. Limits shall equal those limits as may be required by applicable Laws or as Lender may reasonably specify. If state law allows, Lender shall be named as an additional insured on such policy.

## II    <u>Requirements of Insurance Policies</u>.

    (a)    All insurance policies shall be issued by an insurer or insurers with and A.M. Best rating of A:IX or better or a Standard and Poor's rating of "AA", or equivalent rating from another agency acceptable to Lender and be licensed in the State where the Project is located.  All insurance acquired pursuant to this Exhibit shall be in form, amounts and with coverage and deductibles satisfactory to Lender, in Lender's sole discretion.

    (b)    The All Risk required pursuant to Section I., Subsections (a) and (b), shall name Borrower as the insured and shall also name Lender as Loss Payee and Mortgagee, under a non-contributing standard mortgagee clause. Without Lender's prior written consent, Borrower shall not name any Person other than Lender, as loss payee under any property insurance policies that Borrower is required to insure pursuant to any Lease.

    (c)    The Commercial General Liability, Auto Liability and Dram Shop set forth in Section I., Subsections (c) and (f), shall name Lender, its directors, officers, and employees as Additional Insureds.

    (d)    The amount of any deductible under any insurance policy must be reasonably acceptable to Lender.

(e)    Borrower may provide required insurance under blanket policies. Borrower shall not maintain any insurance on the Project that does not name Lender as Loss Payee.

(f)    Borrower shall pay the premiums for the insurance policies as the same become due and payable.  Borrower shall deliver to Lender certified copies of the insurance policies required to be maintained pursuant to the Exhibit within sixty (60) days after the Closing Date or ten (10) days after the issuance of the policies by the insurer, whichever is later, but in all events, no later than ninety (90) days after the Closing Date, and failure to do so will be an immediate Event of Default. Notwithstanding the foregoing, Lender shall not be deemed by reason of the custody of such insurance policies to have knowledge of the contents thereof.  Borrower also shall deliver to Lender, within ten (10) days of Lender's request, a certificate of Borrower or Borrower's insurance agent setting forth the particulars as to all such insurance policies, that all premiums due thereon have been paid currently and that the same are in full force and effect.    BORROWER SHALL DELIVER A CERTIFICATE OR OTHER EVIDENCE OF INSURANCE ACCEPTABLE TO LENDER EVIDENCING THE INSURANCE REQUIRED HEREUNDER ON THE CLOSING DATE, TOGETHER WITH RECEIPTS FOR THE PAYMENT OF PREMIUMS THEREON.    ALL CERTIFICATES FOR PROPERTY INSURANCE MUST BE ON ACCORD FORM 27 or 28 or the equivalent; ACCORD 25 certificates are acceptable for liability insurance. Not later than fifteen (15) days prior to the expiration date of each of the insurance policies Borrower shall deliver to Lender a certificate of insurance evidencing renewal of coverage as required herein.  Within ten (10) days after such renewal, Borrower shall deliver to Lender evidence of payment of premium satisfactory to Lender.  Not later than ninety (90) days after the renewal of each of the insurance policies, Borrower shall deliver to Lender an original or certified copy (as required pursuant to this Section of a renewal policy or policies.

(g)    Each insurance policy shall contain a provision whereby the insurer agrees that so long as the Loan is outstanding, such policy shall not be canceled or fail to be renewed, lapsed or materially changed without in each case, at least thirty (30) days prior written notice to Lender, except ten (10) days for non-payment of premium.

(h)    In the event any insurance policy (except for general and other liability and Workers Compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of; (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured; (B) the occupancy or use of the property for purposes more hazardous than permitted by the terms thereof; or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of this Exhibit.  .

(i)    Any insurance maintained pursuant to this Exhibit may be evidenced by blanket insurance policies covering the premises and other properties or assets of Borrower or its affiliates; provided that any such

E-iii

policy shall in all other respects comply with the requirements of this section. Lender, in its reasonable discretion, shall determine whether such blanket policies sufficient limits of insurance.

(j)    Any insurance carried by Lender shall be for its sole benefit and shall not inure to the benefit of Borrower and Insurance required from Borrower shall be primary to any available, if any, to Lender.

(k)    All required policies, other than professional liability, shall provide that insurers have waived rights of subrogation against Lender. The required insurance shall be primary without right of contribution from any insurance, which may be carried by Lender.

(l)    The required limits are minimum limits established by Lender and nothing contained herein shall be construed to mean the required limits are adequate or appropriate to protect Borrower from greater loss.

Final insurance policies should be sent to the attention of:

Josefina Reyes
Corus Bank, N.A.
3959 N. Lincoln Avenue
Chicago, IL 60613
Tel:  (773) 832-3543

If there are any questions regarding our insurance requirements, please contact our insurance consultants:

Marsh, 500 West Monroe, Chicago, IL 60661
Attention: Anne Roberts
anne.c.roberts@marsh.com
Tel: (312) 627 6711 or Fax: (312) 627 6437

**Illinois Collateral Protection Act Notice**

Unless Borrower provides Lender with evidence of the insurance coverage required by this Agreement, Lender may purchase insurance at Borrower's expense to protect Lender's interest in the Project. This insurance may, but need not, protect Borrower's interest. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the Project. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by this Agreement. If Lender purchases insurance for the Project, Borrower will be responsible for the cost of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The cost of the insurance may be added to Borrower's total outstanding balance or obligation. The cost of insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

## EXHIBIT F

Renovation Schedule

Attached.

Renovation Schedule

| | Cost | Occurrences | Total | Notes |
|---|---|---|---|---|
| **Unit Preparation** | | | | |
| Paint Unit Interiors | 850 | 774 | 657,900 | |
| Replace Carpeting | 1,450 | 774 | 1,122,300 | |
| Repairs and Make Ready | 800 | 774 | 619,200 | |
| Unit Cleaning | 200 | 774 | 154,800 | |
| HVAC Replacements | 1,500 | 39 | 58,050 | Assumes 5% of HVAC units |
| HVAC Service | 95 | 774 | 73,530 | |
| Appliance Replacements | 1,900 | 116 | 220,590 | Assumes 15% of Appliances |
| | | | 0 | |
| | | | 0 | |
| | | | 0 | |
| | | | 0 | |
| | | | 0 | |
| | | | 0 | |
| **Exterior & Common Area Preparation** | | | | |
| Parking Lot Repairs and Maintenance | 45,000 | 3 | 135,000 | |
| Landscape Repairs & Improvements | 125,000 | 1 | 125,000 | |
| Amenity Repairs & Upgrades | 175,000 | 1 | 175,000 | |
| Cool-Deck 3 Sky Breezeways phase 3 | 12,000 | 3 | 36,000 | |
| Misc Exterior Repairs & Upgrades | 225,000 | 1 | 225,000 | |
| | | | 0 | |
| | | | 0 | |
| | | | 0 | |
| Contingency | | | 657,630 | |
| **Total** | | | 4,258,000 | |

# EXHIBIT G

**Proposed Project Budget**

**Exhibit G**
**Approved Project Budget**
**Lansbrook Village Apartments**

| Project Costs: | At Acquisition | Post Closing | Total | Final per s.f. |
|---|---|---|---|---|
| Purchase Price | 105,997,044 | 0 | 105,997,044 | 119.42 |
| Closing Legal | 139,705 | 0 | 139,705 | 0.16 |
| Title Insurance | 47,644 | 0 | 47,644 | 0.05 |
| Mortgage Recording | 584,972 | 0 | 584,972 | 0.66 |
| Third Party Reports | 26,400 | 0 | 26,400 | 0.03 |
| Prepaid Insurance (Dn Pymnt) | 147,638 | 0 | 147,638 | 0.17 |
| Working Capital/Deficits/HOA | 200,000 | 0 | 200,000 | 0.23 |
| Misc. Closing Costs | 43,193 | 0 | 43,193 | 0.05 |
| Bank upfront fee | 1,125,600 | 0 | 1,125,600 | 1.27 |
| Funded at Acquisition | 108,312,195 | 0 | 108,312,195 | 122.02 |
| | | | | |
| **Hard Costs:** | | | | |
| Apt prep and upgrade | 0 | 4,260,000 | 4,260,000 | 4.80 |
| Sales model | 0 | 500,000 | 500,000 | 0.56 |
| Common corridors | 0 | 0 | 0 | 0.00 |
| Total hard costs | 0 | 4,760,000 | 4,760,000 | 5.36 |
| | | | | |
| **Soft Costs:** | | | | |
| Real estate taxes | 0 | 1,440,000 | 1,440,000 | 1.62 |
| Insurance (bal of 1 year) | 0 | 358,170 | 358,170 | 0.40 |
| Condo Docs | 0 | 135,000 | 135,000 | 0.15 |
| Marketing | 0 | 2,082,015 | 2,082,015 | 2.35 |
| Developer's fee | 0 | 1,000,000 | 1,000,000 | 1.13 |
| Interest reserve - Senior Loan | 0 | 1,500,000 | 1,500,000 | 1.69 |
| Interest reserve - Mezzanine Loan | 0 | 2,560,000 | 2,560,000 | 2.88 |
| Contingency | 0 | 412,620 | 412,620 | 0.46 |
| Total soft costs | 0 | 9,487,805 | 9,487,805 | 10.69 |
| | | | | |
| Total project costs | 108,312,195 | 14,247,805 | 122,560,000 | 138.07 |
| | | | | |
| **Project Funding:** | | | | |
| Corus Senior Loan | 84,312,195 | 11,687,805 | 96,000,000 | 108.15 |
| Corus Mezzanine Loan | 14,000,000 | 2,560,000 | 16,560,000 | 18.66 |
| Total Corus Loan | 98,312,195 | 14,247,805 | 112,560,000 | 126.81 |
| Equity Contribution | 10,000,000 | 0 | 10,000,000 | 11.27 |
| | | | | |
| Total sources | 108,312,195 | 14,247,805 | 122,560,000 | 138.07 |
| | 0 | 0 | 0 | |

## EXHIBIT H

### Draw Request Form







Engineer's Disbursement #: 5          Project Budget Requested Disbursement Summary

INTERAcTA IN CULUMN [-], [E], [F] & [G] ONLY

[A] = THE DISBURSEMENT # IN THE SHEET. MUST CORRESPOND TO THE SUBSEQUENT [B] = SHOWN ABOVE IN CELL. #



| Fund | | 315,000 | | | | | | | 315,000 |



Borrower's Disbursement #:     0          Project Budget Requested Disbursement Summary

WHERE DATA IS CHANGING (i.e. E1, E2, E4-E9) ONLY

"(A) THE DISBURSEMENT # IS WORKBOOK, MUST CORRESPOND TO THE DISBURSEMENT # SHOWN ABOVE IN CELL E2



| | (A) | (B) | | | | |
|---|---|---|---|---|---|---|
| 11 Asbestos Model | | $ | 398,000 | | | |

Reviewer's Disbursement #:        8          Project Budget Requested Disbursement Summary

NOTE DATA IN COLUMNS (A), (B), (C) & (D) ONLY

[#] = THE DISBURSEMENT # in WORKSHEET, MUST CORRESPOND TO THE INDIVIDUAL ROW # SHOWN ABOVE HERE.



## EXHIBIT I

### BORROWER(S) VOLUNTARY WAIVER OF LENDER'S OBLIGATION TO PROVIDE ANY FUTURE STATUTORY WARNINGS UNDER § 713.3471(1), FLORIDA STATUTES

Borrower(s):    _____

Lender:        CORUS BANK, N.A.

Loan(s): Loan(s) secured by real estate in Florida made by CORUS BANK, N.A. to _____
_____ described as follows:

  Loan in the initial principal amount of $_____ under Loan Agreement dated _____
  _____ as amended from time to time for development and renovation of improvements located at
  _____, Florida.

By your signature below, Borrower(s) acknowledges the following:

  1.  Prior to making any loan disbursement to Borrower(s), pursuant to the requirements of § 713.3471(1), Florida Statutes, Lender is required to provide Borrower(s) with the following statutory warning:

## WARNING!

YOUR LENDER IS MAKING A LOAN DISBURSEMENT DIRECTLY TO YOU AS BORROWER, OR JOINTLY TO YOU AND ANOTHER PARTY. TO PROTECT YOURSELF FROM HAVING TO PAY TWICE FOR THE SAME LABOR, SERVICES, OR MATERIALS USED IN MAKING THE IMPROVEMENTS TO YOUR PROPERTY, BE SURE THAT YOU REQUIRE YOUR CONTRACTOR TO GIVE YOU LIEN RELEASES FROM EACH LIENOR WHO HAS SENT YOU A NOTICE TO OWNER EACH TIME YOU MAKE A PAYMENT TO YOUR CONTRACTOR.

  2.  Lender has furnished to Borrower and Borrower(s) has read the foregoing warning and understands his/her/its obligations identified therein;

I-i

3. Borrower(s) hereby voluntarily and knowingly waives his/her/its statutory right to receive additional copies of the warning before each and every disbursement under the Loan(s) or any other related loan;

4. Borrower(s) request Lender to disburse all future advancements under the Loan(s) without the statutory warning to Borrower(s);

5. Borrower(s) understands that he/she/it does not have to waive this right as a condition to receiving the Loan(s), but does so to avoid the requirement of additional paperwork prior to each disbursement which could unnecessarily delay a disbursement under the Loan(s);

6. Borrower(s) hereby waives any claim for damages against Lender, which might arguably arise or could be claimed as the result of Lender failing to provide the statutory warning prior to each disbursement.

By: _____

Name: _____

Title: _____

i-ii

## EXHIBIT J

**Price List**

**Attached.**

Report Prepared By:



The Condo Store

# Lansbrook Village
## Tampa, FL
### Phase I - Windsor

| Inventory by Plan | |
|---|---|
| 1BR/1BA | 32 |
| 1BR/1BAVilla | 31 |
| 1BR/1BADenVilla | 13 |
| 2BR/1BA | 32 |
| 2BR/2BA | 52 |
| 2BR/2BAVilla | 46 |
| 3BR/2BA | 32 |
| 3BR/2.5BAVilla | 28 |
| Total | 266 |

| Inventory by Type | |
|---|---|
| A | 31 |
| B | 13 |
| C | 40 |
| D | 28 |
| E | 52 |
| F | 32 |
| G | 62 |
| H | 32 |
| Total | 266 |

| Inventory by Status | |
|---|---|
| Contracts | 0 |
| Pending | 0 |
| Hold | 266 |
| Closed | 0 |
| Available | 0 |
| Total | 266 |

| | |
|---|---|
| Total Sales Price | $51,718,800 |
| Avg per Home | $194,707 |
| Total Sq Ft | 296,607 |
| Avg per Sq Ft | $174 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | 101 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 1 | 102 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 1 | 103 | H | 1BR/1BA | E | 820 | $149,500 | $183 |
| 1 | 104 | H | 1BR/1BA | E | 820 | $149,000 | $183 |
| 1 | 201 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 1 | 202 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 1 | 203 | H | 1BR/1BA | E | 820 | $149,000 | $183 |
| 1 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 2 | 101 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 2 | 102 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 2 | 103 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 2 | 104 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 2 | 201 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 2 | 202 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 2 | 203 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 2 | 204 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 3 | 101 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 3 | 102 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 3 | 103 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 3 | 104 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 3 | 201 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 3 | 202 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 3 | 203 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 3 | 204 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 4 | 101 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 4 | 102 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 4 | 103 | H | 1BR/1BA | E | 820 | $149,500 | $183 |
| 4 | 104 | H | 1BR/1BA | E | 820 | $149,000 | $183 |
| 4 | 201 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 4 | 202 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 4 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 4 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 5 | 101 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 5 | 102 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 5 | 103 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 5 | 104 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 5 | 201 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5 | 202 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 5 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 5 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 6 | 101 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 6 | 102 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 6 | 103 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 6 | 104 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 6 | 201 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 6 | 202 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 6 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 6 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 7 | 101 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 7 | 102 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 7 | 103 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 7 | 104 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 7 | 201 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 7 | 202 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 7 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 7 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 8 | 101 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 8 | 102 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 8 | 103 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 8 | 104 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 8 | 201 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 8 | 202 | H | 2BR/2BA | G | 1,080 | $184,900 | $170 |
| 8 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 8 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 9 | 101 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 9 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 9 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 9 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 9 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 9 | 106 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 10 | 101 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 10 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 10 | 103 | H | 2BA/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 10 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 10 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 10 | 106 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 11 | 101 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 11 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 11 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 11 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 11 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 11 | 106 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 12 | 101 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 12 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 12 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 12 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 12 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 12 | 106 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 13 | 101 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 13 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 13 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 13 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 13 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 13 | 106 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 14 | 101 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 14 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 14 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 14 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 14 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 14 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 15 | 101 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 15 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 15 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 15 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 15 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 15 | 106 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 15 | 101 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 15 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 16 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 16 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 16 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 16 | 106 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 17 | 101 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 17 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 17 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 17 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 18 | 101 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 18 | 102 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 18 | 103 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 18 | 104 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 18 | 201 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 18 | 202 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 18 | 203 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 18 | 204 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 19 | 101 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 19 | 102 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 19 | 103 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 19 | 104 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 19 | 201 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 19 | 202 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 19 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 19 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 20 | 101 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 20 | 102 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 20 | 103 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 20 | 104 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 20 | 201 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 20 | 202 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 20 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 20 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 21 | 101 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 21 | 102 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 21 | 103 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 21 | 104 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 21 | 201 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 21 | 202 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 21 | 203 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 21 | 204 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 22 | 101 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 22 | 102 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 22 | 103 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 22 | 104 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 22 | 201 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 22 | 202 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 22 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 22 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 23 | 101 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 23 | 102 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 23 | 103 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 23 | 104 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 23 | 201 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |

| 23 | 202 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
|----|-----|---|---------|---|-------|----------|------|
| 23 | 203 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 23 | 204 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 24 | 101 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 24 | 102 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 24 | 103 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 24 | 104 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 24 | 201 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 24 | 202 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 24 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 24 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 25 | 101 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 25 | 102 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 25 | 103 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 25 | 104 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 25 | 201 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 25 | 202 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 25 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 25 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 26 | 101 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 26 | 102 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 26 | 103 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 26 | 104 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 26 | 201 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 26 | 202 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 26 | 203 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 26 | 204 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 27 | 101 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 27 | 102 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 27 | 103 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 27 | 104 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 27 | 201 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 27 | 202 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 27 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 27 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 28 | 101 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 28 | 102 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 28 | 103 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 28 | 104 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 28 | 201 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 28 | 202 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 28 | 203 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 28 | 204 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 29 | 101 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 29 | 102 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 29 | 103 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 29 | 104 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 29 | 201 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 29 | 202 | H | 3BR/2BA | H | 1,255 | $215,900 | $172 |
| 29 | 203 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 29 | 204 | H | 2BR/1BA | F | 980 | $174,900 | $178 |
| 30 | 101 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 30 | 102 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 30 | 103 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 30 | 104 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 30 | 201 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 30 | 202 | H | 2BR/2BA | G | 1,090 | $184,900 | $170 |
| 30 | 203 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 30 | 204 | H | 1BR/1BA | E | 820 | $149,900 | $183 |
| 31 | 101 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 31 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 31 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 31 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 32 | 101 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 32 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 32 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 32 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 33 | 101 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 33 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 33 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 33 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 33 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 33 | 106 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 34 | 101 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 34 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 34 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 34 | 104 | N | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 34 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 34 | 106 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 35 | 101 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 35 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 35 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 35 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 35 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 35 | 106 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 36 | 101 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 36 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 36 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 36 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 36 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 36 | 106 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 37 | 101 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 37 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 37 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 37 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 37 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 37 | 106 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 38 | 101 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 38 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 38 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 38 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 38 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 38 | 106 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 39 | 101 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 39 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 39 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 39 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 39 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 39 | 106 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 40 | 101 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 40 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 40 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 40 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |
| 40 | 105 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 40 | 106 | H | 1BR/1BA/Den/Villa | B | 978 | $169,900 | $174 |
| 41 | 101 | H | 1BR/1BA/Villa | A | 863 | $159,900 | $185 |
| 41 | 102 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 41 | 103 | H | 2BR/2BA/Villa | C | 1,142 | $195,900 | $172 |
| 41 | 104 | H | 3BR/2.5BA/Villa | D | 1,450 | $242,900 | $168 |

Report Prepared By:

**COLDWELL BANKER** ®

The Condo Store

# Lansbrook Village
## Tampa, FL
### Phase II - Cambridge

| Inventory by Plan | |
|---|---|
| 1BR/1BA | 48 |
| 1BR/1BA/Loft | 45 |
| 2BR/2BA | 35 |
| 2BR/2BA/Loft | 35 |
| 3BR/2BA | 26 |
| 3BR/2BA/Loft | 26 |
| 4BR/2BA | 10 |
| 4BR/2BA/Loft | 10 |
| Total | 240 |

| Inventory by Type | |
|---|---|
| E1 | 48 |
| E2 | 45 |
| G1 | 35 |
| G2 | 35 |
| H1 | 26 |
| H2 | 26 |
| I1 | 10 |
| I2 | 10 |
| Total | 240 |

| Inventory by Status | |
|---|---|
| Contracts | 0 |
| Pending | 0 |
| Hold | 240 |
| Closed | 0 |
| Available | 0 |
| Total | 240 |

| Total Sales Price | $51,195,080 |
|---|---|
| Avg per Home | $213,317 |
| Total Sq Ft | 297,356 |
| Avg per Sq Ft | $172 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 1 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 1 | 103 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 1 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 1 | 105 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 1 | 106 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 1 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 1 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 1 | 203 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 1 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 1 | 205 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 1 | 206 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 2 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 2 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 2 | 103 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 2 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 2 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 2 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 2 | 203 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 2 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 3 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 3 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 3 | 103 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 3 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 3 | 105 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 3 | 106 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 3 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 3 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 3 | 203 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 3 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 3 | 205 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3 | 206 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 4 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 4 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 4 | 103 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 4 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 4 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 4 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 4 | 203 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 4 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 5 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 5 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 5 | 103 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 5 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 5 | 105 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 5 | 106 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 5 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 5 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 5 | 203 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 5 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 5 | 205 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 5 | 206 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 6 | 101 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 6 | 102 | H | 4BR/2BA | I1 | 1546 | $265,900 | $172 |
| 6 | 103 | H | 4BR/2BA | I1 | 1546 | $265,900 | $172 |
| 6 | 104 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 6 | 201 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 6 | 202 | H | 4BR/2BA/Loft | I2 | 1705 | $288,900 | $169 |
| 6 | 203 | H | 4BR/2BA/Loft | I2 | 1705 | $288,900 | $169 |
| 6 | 204 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 7 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 7 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 7 | 103 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 7 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 7 | 105 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 7 | 106 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 7 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 7 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 7 | 203 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 7 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 7 | 205 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 7 | 206 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 8 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 8 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 8 | 103 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 8 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 8 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 8 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 8 | 203 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 8 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 9 | 101 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 9 | 102 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 9 | 103 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 9 | 104 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 9 | 201 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 9 | 202 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 9 | 203 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 9 | 204 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 10 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 10 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 10 | 103 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 10 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 10 | 105 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 10 | 106 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 10 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 10 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 10 | 203 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 10 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 10 | 205 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 10 | 206 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 11 | 101 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 11 | 102 | H | 4BR/2BA | I1 | 1546 | $265,900 | $172 |
| 11 | 103 | H | 4BR/2BA | I1 | 1546 | $265,900 | $172 |
| 11 | 104 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 11 | 201 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 11 | 202 | H | 4BR/2BA/Loft | I2 | 1705 | $288,900 | $169 |
| 11 | 203 | H | 4BR/2BA/Loft | I2 | 1705 | $288,900 | $169 |
| 11 | 204 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 12 | 101 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 12 | 102 | H | 4BR/2BA | I1 | 1546 | $265,900 | $172 |
| 12 | 103 | H | 4BR/2BA | I1 | 1546 | $265,900 | $172 |
| 12 | 104 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 12 | 201 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 12 | 202 | H | 4BR/2BA/Loft | I2 | 1705 | $288,900 | $169 |
| 12 | 203 | H | 4BR/2BA/Loft | I2 | 1705 | $288,900 | $169 |
| 12 | 204 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 13 | 101 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 13 | 102 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 13 | 103 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 13 | 104 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 13 | 201 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 13 | 202 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 13 | 203 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 13 | 204 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 14 | 101 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 14 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 14 | 103 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 14 | 104 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 14 | 201 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 14 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 14 | 203 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 14 | 204 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 15 | 101 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 15 | 102 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 15 | 103 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 15 | 104 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 15 | 201 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 15 | 202 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 15 | 203 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 15 | 204 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 16 | 101 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |

| 16 | 102 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
|----|-----|---|---------|-----|------|----------|------|
| 16 | 103 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 16 | 104 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 16 | 201 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 16 | 202 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 16 | 203 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 16 | 204 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 17 | 101 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 17 | 102 | H | 4BR/2BA | I1 | 1546 | $265,900 | $172 |
| 17 | 103 | H | 4BR/2BA | I1 | 1546 | $265,900 | $172 |
| 17 | 104 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 17 | 201 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 17 | 202 | H | 4BR/2BA/Loft | I2 | 1705 | $288,900 | $169 |
| 17 | 203 | H | 4BR/2BA/Loft | I2 | 1705 | $288,900 | $169 |
| 17 | 204 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 18 | 101 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 18 | 102 | H | 4BR/2BA | I1 | 1546 | $265,900 | $172 |
| 18 | 103 | H | 4BR/2BA | I1 | 1546 | $265,900 | $172 |
| 18 | 104 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 18 | 201 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 18 | 202 | H | 4BR/2BA/Loft | I2 | 1705 | $288,900 | $169 |
| 18 | 203 | H | 4BR/2BA/Loft | I2 | 1705 | $288,900 | $169 |
| 18 | 204 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 19 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 19 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 19 | 103 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 19 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 19 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 19 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 19 | 203 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 19 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 20 | 101 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 20 | 102 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 20 | 103 | H | 3BR/2BA | H1 | 1382 | $234,900 | $170 |
| 20 | 104 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 20 | 201 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 20 | 202 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 20 | 203 | H | 3BR/2BA/Loft | H2 | 1541 | $260,900 | $169 |
| 20 | 204 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 21 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 21 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 21 | 103 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 21 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 21 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 21 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 21 | 203 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 21 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 22 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 22 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 22 | 103 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 22 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 22 | 105 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 22 | 106 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 22 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 22 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |

| 22 | 203 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
|----|-----|---|--------------|----|------|----------|------|
| 22 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 22 | 205 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 22 | 206 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 23 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 23 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 23 | 103 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 23 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 23 | 105 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 23 | 106 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 23 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 23 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 23 | 203 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 23 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 23 | 205 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 23 | 206 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 24 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 24 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 24 | 103 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 24 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 24 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 24 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 24 | 203 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 24 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 25 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 25 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 25 | 103 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 25 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 25 | 105 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 25 | 106 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 25 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 25 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 25 | 203 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 25 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 25 | 205 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 25 | 206 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 26 | 101 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 26 | 102 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 26 | 103 | H | 2BR/2BA | G1 | 1216 | $206,900 | $170 |
| 26 | 104 | H | 1BR/1BA | E1 | 905 | $163,900 | $181 |
| 26 | 201 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |
| 26 | 202 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 26 | 203 | H | 2BR/2BA/Loft | G2 | 1375 | $232,900 | $169 |
| 26 | 204 | H | 1BR/1BA/Loft | E2 | 1060 | $184,900 | $174 |

Report Prepared By:

**COLDWELL BANKER**

THE CONDO STORE

# Lansbrook Village
## Tampa, FL
Phase IV - Hampton

| Inventory by Plan | |
|---|---|
| 1BR/1BA | 87 |
| 2BR/2BA | 116 |
| 3BR/2BA | 51 |
| Total | 254 |

| Inventory by Type | |
|---|---|
| A | 48 |
| A1 | 38 |
| A2 | 39 |
| B1 | 40 |
| B2 | 40 |
| C | 36 |
| D | 12 |
| Total | 254 |

| Inventory by Status | |
|---|---|
| Contracts | 0 |
| Pending | 0 |
| Hold | 254 |
| Closed | 0 |
| Available | 0 |
| Total | 254 |

| Total Sales Price | $52,455,600 |
|---|---|
| Avg per Home | $206,518 |
| Total Sq Ft | 293,799 |
| Avg per Sq Ft | $178 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 1 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 1 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 1 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 1 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 1 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 1 | 107 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 1 | 108 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 1 | 109 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 1 | 110 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 2 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 2 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 2 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 2 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 2 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 2 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 2 | 107 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 2 | 108 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 3 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 3 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 3 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 3 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 3 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 3 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 3 | 107 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 3 | 108 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 4 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 4 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 4 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 4 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 4 | 105 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 4 | 106 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 5 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 5 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 5 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 5 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5 | 105 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 5 | 106 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 6 | 101 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 6 | 102 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 6 | 103 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 104 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 105 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 106 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 107 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 6 | 108 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 6 | 201 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 6 | 202 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 6 | 203 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 204 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 205 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 206 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 207 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 6 | 208 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 6 | 301 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 6 | 302 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 6 | 303 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 304 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 305 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 306 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 6 | 307 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 6 | 308 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 7 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 7 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 7 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 7 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 7 | 105 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 7 | 106 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 8 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 8 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 8 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 8 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 8 | 105 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 8 | 106 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 9 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 9 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 9 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 9 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 9 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 9 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 9 | 107 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 9 | 108 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 10 | 101 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 10 | 102 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 10 | 103 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 104 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 105 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 106 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 107 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 10 | 108 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 10 | 201 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |

| 10 | 202 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 10 | 203 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 204 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 205 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 206 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 207 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 10 | 208 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 10 | 301 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 10 | 302 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 10 | 303 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 304 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 305 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 306 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 10 | 307 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 10 | 308 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 11 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 11 | 102 | H | 2BR/2BA | B2 | 1,234 | $215,900 | $175 |
| 11 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 11 | 104 | H | 1BR/1BA | A1 | 963 | $179,900 | $188 |
| 11 | 105 | H | 1BR/1BA | A1 | 963 | $179,900 | $186 |
| 11 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 11 | 107 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 11 | 108 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 11 | 109 | H | 2BR/2BA | B2 | 1,234 | $215,900 | $175 |
| 11 | 110 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 12 | 101 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 12 | 102 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 12 | 103 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 104 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 105 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 106 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 107 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 12 | 108 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 12 | 201 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 12 | 202 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 12 | 203 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 204 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 205 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 206 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 207 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 12 | 208 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 12 | 301 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 12 | 302 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 12 | 303 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 304 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 305 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 306 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 12 | 307 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 12 | 308 | H | 3BR/2BA | D | 1,230 | $236,900 | $193 |
| 13 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 13 | 102 | H | 2BR/2BA | B2 | 1,234 | $215,900 | $175 |
| 13 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 13 | 104 | H | 1BR/1BA | A1 | 963 | $179,900 | $186 |
| 13 | 105 | H | 2BR/2BA | B2 | 1,234 | $215,900 | $175 |
| 13 | 106 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |

| 14 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
|----|-----|---|---------|----|-------|----------|------|
| 14 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 14 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 14 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 14 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 14 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 14 | 107 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 14 | 108 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 15 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 15 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 15 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 15 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 15 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 15 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 15 | 107 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 15 | 108 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 15 | 109 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 15 | 110 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 16 | 101 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 16 | 102 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 16 | 103 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 104 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 105 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 106 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 107 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 16 | 108 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 16 | 201 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 16 | 202 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 16 | 203 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 204 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 205 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 206 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 207 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 16 | 208 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 16 | 301 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 16 | 302 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 16 | 303 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 304 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 305 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 306 | H | 1BR/1BA | A | 820 | $164,900 | $201 |
| 16 | 307 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 16 | 308 | H | 2BR/2BA | C | 1,153 | $198,900 | $173 |
| 17 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 17 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 17 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 17 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 17 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 17 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 17 | 107 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 17 | 108 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 18 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 18 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 18 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 18 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 18 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |

| 18 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
|---|---|---|---|---|---|---|---|
| 18 | 107 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 18 | 108 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 19 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 19 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 19 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 19 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 19 | 105 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 19 | 106 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 20 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 20 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 20 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 20 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 20 | 105 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 20 | 106 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 21 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 21 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 21 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 21 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 21 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 21 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 21 | 107 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 21 | 108 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 21 | 109 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 21 | 110 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 22 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 22 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 22 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 22 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 22 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 22 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 22 | 107 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 22 | 108 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 22 | 109 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 22 | 110 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 23 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 23 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 23 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 23 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 23 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 23 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 23 | 107 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 23 | 108 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 24 | 101 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |
| 24 | 102 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 24 | 103 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 24 | 104 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 24 | 105 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 24 | 106 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 24 | 107 | H | 1BR/1BA | A1 | 963 | $178,900 | $186 |
| 24 | 108 | H | 3BR/2BA | A2 | 1,587 | $267,900 | $169 |
| 24 | 109 | H | 2BR/2BA | B2 | 1,234 | $216,900 | $176 |
| 24 | 110 | H | 2BR/2BA | B1 | 1,234 | $210,900 | $171 |

D

**EXHIBIT D**
**1 of 2**

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

CORUS BANK, N.A., a national banking
association,

      Plaintiff,

vs.                                                                                      CASE NO. 08-000587CI-013

FLORIDA LAND PARCELS, LLC, a Delaware limited
liability company, f/k/a Florida Land Parcels, L.P., a
Delaware limited partnership, PRE PROPERTY B., L.L.C.,
a Delaware limited liability company, as successor in interest
by merger with Lansbrook Cambridge Apartments, LLC, a
Delaware limited liability company, CARVILL LIMITED
PARTNERSHIP, a Delaware limited partnership, EDUARD
DE GUARDIOLA, H.E.L.P. REALTY, INC., a Florida
corporation, VILLAGES AT LANSBROOK PROPERTY
OWNERS ASSOCIATION, INC., a Florida not-for-profit
corporation, LANSBROOK VILLAGE CONDOMINIUM
ASSOCIATION, INC., a Florida not-for-profit corporation,
and LIFESTYLE CARPETS, INC., a Florida corporation,

      Defendants.
_____/

## CORUS BANK, N.A.'S EMERGENCY MOTION TO APPOINT A RECEIVER AND/OR ENFORCE ASSIGNMENT OF RENTS PURSUANT TO FLA. STAT. § 697.07 AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, Corus Bank, N.A. (the "Bank"), by and through its undersigned counsel, hereby

files its Emergency Motion to Appoint a Receiver (the "Motion") for the real and personal

property that is, inter alia, the subject of this litigation and owned by Defendants, Florida Land

Parcels, LLC, pre Property b., L.L. and Carvill Limited Partnership (collectively, the

"Borrower"). In support hereof, Plaintiff avers as follows:

### INTRODUCTION

The property which secures the mortgage loan (the "Loan") the subject matter of this

action, consists of 509 unsold condominium units owned by Borrower together with personal

property and fixtures located therein or related thereto (the "Property"). The unsold units, along

with 265 previously sold units comprise a development known as Lansbrook Village. Said Property is being mismanaged by Borrower, which mismanagement threatens to destroy and further erode Lansbrook Village as a going concern and constitutes waste. Upon information and belief, the Bank has determined that the property insurance for the Property is insufficient due to extremely high deductible amounts and an expiration during the middle of the summer hurricane season. Since initiation of this action owners of sold units have advised the Bank that Borrower, whose members and managers completely control the condominium association as its largest member and is responsible for maintaining the common areas, may have used assessments for purposes other than to maintain the common areas, have failed to provide financial statements as required by Florida law and demanded by the unit owners, have failed to appear at meetings to address complaints and concerns of the unit owners and have otherwise allowed the common areas and the Property to deteriorate without proper management or control. On information and belief, many of the unit owners have ceased paying dues as a result of Borrower mismanagement.

Borrower has failed to correctly account for expenses being run through the association's books, making discretionary allocations of property expenses charged to the association, and a genuine concern exists as to whether adequate reserves are being deposited for future improvements to units.

In addition, Borrower failed to remit payment of all outstanding real property taxes for 2006 resulting in Bank advancing payment for those taxes. Revenue from operations of Lansbrook Village is insufficient to pay for 2007 real property taxes, which come due on March 31, 2008, or for property insurance which comes due in July and is generally insufficient to pay for the costs of general maintenance of the Property. As a result of the foregoing, the value and

2

continued viability of Lansbrook Village as a desirable residential community is threatened . . Therefore, the Bank requests this Court to grant a receivership over the Property and Collateral.

## BACKGROUND

1.     The Bank incorporates herein by this reference the allegations set forth in its Verified Complaint (the "Complaint"), which was filed on January 14, 2008.

2.     As set forth in the Complaint:

(a)     As security for the Loan in the original amount of $112,560,000, and as consideration therefore, Borrower granted in favor of the Bank an Amended and Restated Mortgage, Assignment of Rents, Security Agreement, and Fixture Filing (the "Mortgage"). A true and correct copy of the Mortgage is attached hereto, incorporated herein, and marked as Exhibit "H" to the Complaint.

(b)     The Mortgage was recorded in the Office of the Clerk of Courts in and for Pinellas County on July 21, 2005 in Official Records Book 14471, Pages 1968-1998. In the Mortgage, Borrower mortgaged all estate, right, title, and interest that is held in the Property described more particularly in the in favor of Bank to secure the indebtedness of the Notes.

(c)     Additionally in the Mortgage Borrower absolutely and unconditionally assigned to the Bank all of Borrower's estate, right, title, and interest in certain leases and to certain rents both of which are described more particularly in the Mortgage.

(d)     Finally in the Mortgage, Borrower granted to the Bank a security interest (under the Uniform Commercial Code) with respect to any fixtures, leases,

3

rents, personal property, material, reserves, deferred payments, deposits or advance payments for materials, undisbursed Loan proceeds, insurance refunds, impound accounts, refund for overpayment of any kind and proceeds and products thereof owned by Borrower more particularly described in the Mortgage (the "Collateral"). The Bank perfected its security interest by filing UCC financing statements (collectively referred to as the "Financing Statements"), attached hereto, incorporated herein, and marked as Exhibit "I" to the Complaint.

3.       The Property consists of condominium units in three (3) phases or villages commonly known as Lansbrook Village in Palm Harbor, Pinellas County, Florida. Notwithstanding the fact that the original business plan contained in the loan agreement between the Bank and the Borrower required the payoff of the Loan through the sale of units, the Borrower has instead embarked on a leasing program, and now has numerous tenants and acts as a landlord. The tenants pay rent on a monthly basis. The Bank has not received a full accounting of the rents received or operating expenses incurred by Borrower for January, 2008.    The value of the Property will be impaired if Borrower allows waste to occur or does not comply with its responsibilities under the Mortgage or its tenant leases.

4.       The Mortgage reads with respect to assignment of rents:

2.1      Assignment.   Mortgagor hereby irrevocably, absolutely, presently and unconditionally assigns to Mortgagee all rents, royalties, issues, profits, revenue, income, accounts, proceeds and other benefits of the Property, whether now due, past due or to become due, including all prepaid rents and security deposits (some or all collectively, as the context may require, "Rents").

The assignments of Leases and Rents contained in this Mortgage are intended to provide Mortgagee with all of the rights and remedies of mortgagees pursuant to Section 697.07 of the Florida

4

Statutes (hereinafter "Section 697.07"), as may be amended from time to time. However, in no event shall this reference diminish, alter, impair, or affect any other rights and remedies of Mortgagee, including but not limited to, the appointment of a receiver, nor shall any provision in the Section diminish, alter, impair or affect any rights or powers of the receiver in law or equity or as set forth herein. In addition, this assignment shall be fully operative without regard to value of the Property or without regard to the adequacy of the Property to serve as security for the obligations owed by Mortgagor to Mortgagee, and shall be in addition to any rights arising under Section 697.07. Further, except for the notices required hereunder, if any, Mortgagor waives any notice of default or demand for turnover of rents by Mortgagee, together with any rights under Section 697.07 to apply to a court to deposit the Rents into the registry of the court or such other depository as the court may designate (to the extent such waiver is not prohibited by law).

2.2    Grant of License.    Mortgagee hereby confers upon Mortgagor a license ("License") to collect and retain the Rents as they become due and payable, so long as no Event of Default, as defined in Section 6.2 below, shall exist and be continuing. If an Event of Default has occurred and is continuing, Mortgagee shall have the right, which it may choose to exercise in its sole discretion, to terminate this License without notice to or demand upon Mortgagor, and without regard to the adequacy of Mortgagee's security under this Mortgage.

Mortgagor agrees to collect and hold all Rents in trust for Mortgagee and to use the Rents for the payment of the cost of operating and maintaining the Premises and for the timely payment of the Secured Obligations before using the Rents for any other purpose.

See Exhibit "H" to the Complaint.

5.    Additionally, the Mortgage states that, upon an Event of Default the Bank is entitled to the appointment of a receiver. Section 6.3(b) reads:

(b)    Receiver.    Mortgagee shall, as a matter of right, without notice and without giving bond to Mortgagor or anyone claiming by, under or through Mortgagor, and without regard for the solvency or insolvency of Mortgagor or the then value of the Property, to the extent permitted by applicable law, be entitled to have a receiver appointed for all or any part of the Property and the Rents, and the proceeds, issues and profits thereof, with the rights

5

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com.

and powers referenced below and such other rights and powers as the court making such appointment shall confer, and Mortgagor hereby consents to the appointment of such receiver and shall not oppose any such appointment. Such receiver shall have all powers and duties prescribed by applicable law, all other powers which are necessary or usual in such cases for the protection, possession, control, management and operation of the Property, and such rights and powers as Mortgagee would have, upon entering and taking possession of the Property under subsection (c) below. The reasonable expenses, including receiver's fees, reasonable attorneys' fees, costs and agents' compensation, incurred pursuant to the powers herein contained shall be considered part of the Secured Obligations,.

See id. ¶ 6.3(b).

6.     As set forth more fully in the Complaint, an event of default has occurred because Borrower failed to make payments in accordance with the terms and conditions of the Notes (as defined in the Complaint).

7.     Borrower is permitting waste to occur at the Property and to the Collateral. An inspection by a Bank consultant indicated substantial deferred maintenance. Specifically, property inspections reflect estimates of $600,000.00 to $700,000.00 in total capital needs, including $320,000.00 in deferred maintenance expenses, $76,000.00 in unpaid invoices to vendors, and $100,000.00 of appliance deficiencies to get units lease ready. The common areas are not being maintained by Borrower as required under the Declaration of Condominium, most visibly evidenced by non-functioning water features, dead and unkempt landscaping and unpaved parking lots. Basically, the Property does not generate sufficient cash flow to make these repairs and fund these obligations, and Borrower is unwilling to pay for same. In addition, the Bank has received numerous inquiries and complaints from unit owners concerning Borrower's failure to maintain the Property, failure to provide any financial information concerning use of assessments collected by the condominium association that is completely controlled by Borrower, concern over use of assessments for purposes other than maintenance of the common areas, and ignoring

6

the complaints and concerns of unit owners, including use of the common areas by non-members and non-residents in Lansbrook Village. See Affidavit of James A. Savarese attached as Appendix A. Furthermore, the principal person acting as manager of the Borrower entities has advised the Bank that he has been stripped of all authority for the Project as a result of the Bank's decision to file the Bank's foreclosure complaint.

8.  Further, the Loan matures on March 30, 2008 and renewal of the liability and property damage policies of insurance is due on July 14, 2008. Upon information and belief, Borrower has insufficient revenue from operations to renew or procure the insurance coverage required under the Loan. A prudent manager of the Property would immediately commence investigation of the cost and type of insurance available for the Project. Further, the Property is subject to significant vacancies and the marketing and sale of units by Borrower have literally ceased so that repayment of the obligations due under the Loan is a virtual impossibility.

9.  Borrower has failed to escrow real property taxes with the Bank and there is insufficient income derived from the rental of units to pay for interest on the Loan, insurance and the 2007 real property taxes due on or before March 31, 2008. Borrower has acknowledged that income from the project is not sufficient to pay the debt service and meet those costs, including fees due the homeowners' association. See Email of Eduard de Guardiola to Brian Brodeur dated November 15, 2007 attached as Appendix B.

10.  There is no equity in the Property and it continues to deteriorate. As of February 25, 2008 Borrower owed $2,047,626.71 in unpaid interest, $121,594.74 in accrued late charges together with principal in the amount of $63,602,076.91. See Affidavit of Brian Brodeur attached as Appendix C.

7

11.     On January 22, 2008, the Bank sent Borrower a demand letter pursuant to Section

2.1 of the Mortgage and Florida law requesting turnover of rents. Borrower has failed to turnover

the rents collected for February, 2008.

12.     Borrower has failed to pay certain vendors and service providers and a lien in

favor of Defendant, Lifestyles Carpets, Inc. has already been filed of record and encumbers the

Property.

13.     All of these substantial problems are powerful evidence of a significant potential

for the assessment of liens or other encumbrances against the Property and Collateral as well as

the continued reduction in occupancy of the Property, which would adversely affect the value of

the Bank's security for the Loan. The potential for liens and encumbrances as well as the failure

to sell units and reduction in occupancy at the Property constitutes waste.

## THE RELIEF REQUESTED
## AND THE GROUNDS THEREFOR

14.     The Bank is entitled to a receiver being appointed because it is necessary to

preserve the Property and Collateral until a final judgment is obtained. Courts have held that the

purpose of a receiver is to do exactly that and preserve and manage property that is subject to

litigation. The First District has stated explicitly that:

> the function of a receiver is to preserve and manage the property
> which is the subject of the litigation. The appointment of a
> receiver prevents either side from impairing the value of the
> property in anticipation of losing the suit.

Turtle Lake Associates, LTD. v. Third Financial Services, Inc., 518 So.2d 959, 961 (Fla. 1st DCA

1988).

15.     Additionally, like in this case, Florida courts have held that where a mortgagor

agrees in a mortgage that a receiver should be appointed that agreement should be accorded due

weight. The Florida Supreme Court stated:

8

> When a mortgage pledges the rents and profits and consents to the appointment of a receiver upon default, such provisions, while not controlling upon the courts, should be accorded due weight, and may in many cases authorize the appointment of a receiver where without them the application will be denied.

Martarano v. Spicola, 110 Fla. 55, 57, 148 So. 585, 586 (1933).

16.  Moreover, when there is such a contractual provision, like in this case, the burden shifts to the borrower to "very clearly show that the property, exclusive of the rents and profits, is ample security." Smith v. DuPuis, 117 Fla. 222, 228, 157 So. 491, 493 (1934). See also, Florida Reinvestment Corp. v. Cypress Savings Ass'n., 509 So. 2d 1352, 1354 (Fla. 4th DCA 1987); Atco Construction & Development Corp. v. Beneficial Savings Bank, F.S.B., 523 So. 2d 747, 750 (Fla. 5th DCA 1988)("the burden is on the mortgagor to show the property is sufficient").

17.  Moreover, the Florida Supreme Court has stated that a receiver is appropriate:

> Where the parties have expressly contracted for a lien upon the rents and profits, there seems to be no valid reason for depriving the mortgagee thereof because of the fact that the mortgagor is solvent, and the debt may be collected by execution on other property of the mortgagor. Nor should the conditions that there must be danger of loss, waste, destruction, or serious impairment of the property, sometimes prescribed as conditions precedent to the appointment of a receiver, be regarded as material where there is such a stipulation.

Smith v. DuPuis, 117 Fla. at 228.

18.  Borrower is in default of its obligations to the Bank by failing, inter alia, to make interest payments due in excess of $2,000,000.00.

19.  The Bank respectfully submits that the contractual provisions entitling the Bank to the appointment of a receiver upon Borrower's default should be given "due weight" and under the facts and circumstances of this case should lead to an appointment of a receiver.

9

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

20.    Additionally, Borrower is wasting the Property and Collateral. It further appears that Borrower will be unable to pay for insurance coverage on the Property and is unlikely to negotiate insurance coverage that prudently insures the risks associated with the Property.

21.    On January 22, 2008, the Bank sent a letter to Borrower requesting that Borrower turnover the rents pursuant to Section 2.1 of the Mortgage and Borrower has failed and refused to honor the demand despite the Bank's absolute right to the rents.

22.    Pursuant to Section 697.07(4)-(5), Florida Statutes, the Bank requests this Court in addition to or in conjunction with a receivership order enter an order requiring Borrower to immediately turnover any rents that may be in its possession, provide an accounting of any rents subject to the assignment of rents contained in the Mortgage, and turnover all future rents to an account at the Bank.

WHEREFORE, the Bank respectfully requests the immediate entry of an Order stating that:

(a)    A receiver (the "Receiver") is appointed for the Property and Collateral, and all income, profits, and revenues derived therefrom;

(b)    For the benefit of the Bank, the Receiver shall be vested with all powers available to a receiver at law and equity, including, without limitation, the power to gain access to and obtain possession of any and all documents and records of or related to the Property and Collateral in the possession or control of any person or entity, and to hold, demand, receive and collect all rents, issues, assessments and profits arising from or related to the Property and Collateral and to bring such action at law or otherwise to enforce its rights to collect the said rents, issues, assessments or profits;

(c)    The Receiver is authorized and directed to (i) take physical possession and control of the Property and Collateral; and (ii) make such changes to the security code to prevent access to the Property by non-residents;

(d)    The Receiver is directed to deposit any sums collected pursuant to said Order in a federally-insured bank account established for the purpose of the receivership ordered, and is granted signature authority on such accounts, including a separate account to collect assessments for maintenance of the common areas;

10

(e)   The Receiver is authorized and directed to apply any income, profits and other monies to the extent available;

    (i)   to pay for essential maintenance, repairs and ordinary and necessary operating expenses, including the payment of taxes and maintenance of Property insurance, at the Property;

    (ii)   for the benefit of the Bank, to pay the Debt owed to the Bank by Borrower; and

    (iii)   to pay its reasonable fee as Receiver.

(f)   The Bank shall not be required to advance any funds to the Receiver for the purpose of maintaining the Property;

(g)   Nothing in the Receivership Order shall affect the validity or priority of any security interests of the Bank in the Property and Collateral;

(h)   The Receiver shall have the power to oversee and administer operations at the Property, including the common areas, and manage the use of the Collateral;

(i)   The Bank shall not be deemed a mortgagee-in-possession as a result of the appointment of a Receiver;

(j)   Borrower is enjoined from:

    (i)   retaining, taking possession of, collecting or receiving any of the rents, income, assessments or profits of the Property or Collateral or in any way dealing therewith, except for the purpose of turning same over to the Receiver;

    (ii)   interfering with the full and absolute possession and control of the Property or Collateral by the Receiver;

    (iii)   entering upon the Property;

    (iv)   otherwise conducting any activity at the Property; and/or

    (v)   allowing or requesting or encouraging any other person or persons to do any of the foregoing;

(k)   an Order requiring the turnover of a rents in the possession of Borrower and provide an accounting thereof; and

11

(l)     grant such other and further relief as may be just and appropriate.

Respectfully submitted,

HOLLAND & KNIGHT, LLP

Patrick W. Skelton
Florida Bar No. 207012
Holland & Knight LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33601-1222
(813) 227-8500
(813) 229-0134 – facsimile
patrick.skelton@hklaw.com - email

Counsel for the Bank

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of Corus Bank, N.A.'s Emergency
Motion to Appoint a Receiver and/or Enforce Assignment of Rents Pursuant to Section Fla. Stat.
§ 697.07 and Incorporated Memorandum of Law has been furnished this 4th day of March,
2008 via Facsimile (without Exhibits attached to Complaint) and by First Class U.S. Mail to:

Jack C. Shawde, Esq.
Berger Singerman
200 South Biscayne Blvd., Suite 1000
Miami, Florida 33131

Roberta A. Colton, Esq.
Trenam, Kemper, Scharf, Barkin,
  Frye, O'Neill & Mullis, P.A.
101 East Kennedy Blvd., Suite 2700
Tampa, Florida 33602

Gregory R. Haney, Esq.
Morgan W. Streetman. Esq.
Shumaker, Loop & Kendrick, LLP
Suite 2800, Bank of America Plaza
101 East Kennedy Blvd.
Tampa, Florida 33602

Patrick W. Skelton

12

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

CORUS BANK, N.A., a national banking
association,

     Plaintiff,

vs.

FLORIDA LAND PARCELS, LLC, a Delaware limited
liability company, f/k/a Florida Land Parcels, L.P., a
Delaware limited partnership, PRE PROPERTY B., L.L.C.,
a Delaware limited liability company, as successor in interest
by merger with Lansbrook Cambridge Apartments, LLC, a
Delaware limited liability company, CARVILL LIMITED
PARTNERSHIP, a Delaware limited partnership, EDUARD
DE GUARDIOLA, H.E.L.P. REALTY, INC., a Florida
corporation, VILLAGES AT LANSBROOK PROPERTY
OWNERS ASSOCIATION, INC., a Florida not-for-profit
corporation, LANSBROOK VILLAGE CONDOMINIUM
ASSOCIATION, INC., a Florida not-for-profit corporation,
and LIFESTYLE CARPETS, INC., a Florida corporation,

     Defendants.

CASE NO. 08000587CI-013

_____/

## AFFIDAVIT OF JAMES A. SAVARESE

STATE OF FLORIDA
COUNTY OF PINELLAS

     BEFORE ME, the undersigned authority, personally appeared James A. Savarese, who,

first being duly sworn, deposes and says of his personal knowledge:

     1.    That I am an owner and resident of a condominium unit at Lansbrook Village, a

condominium project located in Palm Harbor, Pinellas County, Florida, which project is the

subject of the above foreclosure action. I reside at 4935 Cambridge Blvd., Unit 202, Palm Harbor,

Florida 34685.

2.      That on numerous occasions I have expressed complaints and concerns over issues at the project to the condominium association and to Richard Blatt, Chief Financial Officer of developers' property manager, which I believe is basically an affiliated entity with developer, sharing common ownership and control, without getting any cooperation or response. Specifically, and among other things, I have requested (i) operating/financial statements and budgets for the association, (ii) proof that there has been no co-mingling of unit owner fees with operations of the developer, (iii) reserve account information, (iv) copies of service contracts, (v) that an annual meeting be held as required under the Declaration of Condominium, and (vi) review of active insurance policies and coverage for the common elements, without any response or delivery of the requested information.

3.      The unit owners have repeatedly requested meetings to address their concerns and issues but have been ignored. Following the filing of this foreclosure action the unit owners requested another meeting to address failures to maintain landscaping, security issues, homeowners' dues, budget issues, replacement reserve, and to appoint a unit owner to the Board (which has never been done despite a legal requirement to do so) and a special meeting was noticed by the association for February 13, 2008. Unit owners appeared but despite setting the meeting the developer's agents cancelled the meeting and failed to show up to address unit owners concerns.

4.      The property manager for the developer refuses to follow or enforce the rules and regulations we were given at the time of purchasing our units. There has been a complete failure to provide security with respect to use of the common areas, e.g. pool and workout facilities, by persons who are not residents of Lansbrook Village. In effect, the unit owners continue to pay fees supposedly to defray the cost of maintaining the common facilities while others are permitted to use those facilities cost free and to the detriment thereof.

2.

5.      The common areas are not being maintained and are deteriorating without any

material effort to make necessary repairs.

6.      Unit owners have expressed concern over the use of our condominium dues for

developer purposes unrelated to the common areas but those concerns have gone without

response or delivery of requested documentation addressing same.

7.      The unit owners have not been given a budget for 2008, much less any

information concerning replacement of reserves and verification of insurance which is crucial to

maintaining the condominium property.

8.      Basically, the project is not being properly managed or maintained and the

developer has failed to take any action to avoid to correct the deficiencies.



_____
Affiant

        The foregoing instrument was sworn to and acknowledged before me this 4th day of
March, 2008, by James A. Savarese, who presented _FLORIDA DRIVERS LICENSE_ as
identification or who is personally known to me.

(affix notary seal)


_____
COUNTY OF PINELLAS
Notary Public-State of FLORIDA
Commission Number: DD 410049

Notary Public State of Florida
Gardner Wetenhall
My Commission DD410049
Expires 05/13/2009


5

**From:**   Erica Kazimir
**To:**   Davidson, Matthew
**Date:**   11/15/2007 12:55 PM
**Subject:**   Fwd: Lansbrooke

>>> Brian Brodeur 11/15/2007 9:56 AM >>>
fyi

>>> "Eduard de Guardiola" <Edg@Vistaro.com> 11/15/2007 8:58 AM >>>
This is being sent in advance of a phone call. As you may know, it is my
custom to deliver the bad news up front in writing, so that you have time to
digest it prior to us speaking. It is not intended, of course, to replace a
personal dialogue on the matter.

I am afraid we have reached the end of our rope. I will not insult you and
recite all of the obvious macro changes that have occurred within last 6
months, many of which have compounded our ability to continue to execute a
viable exist strategy on this deal. All of you are well aware of what those
factors are.

We have labored long and hard on the project. Notwithstanding the leasing
success we are achieving, we now realize that there will be no hope to
refinance your debt, even at 100% occupancy. The fractured nature of the
condo regime, coupled with the debacle in the credit markets, essentially
guarantees that there will be no refinance source available. Similarly, we
see no recovery in the Florida condo market in the near term, certainly not
within the next 12-15 months.

We project, at full occupancy, to essentially have a deal that spits out a
5% yield on a cost basis equal to JUST YOUR DEBT. Our debt service, on the
other hand, is in excess of 8.5% (and climbing based on recent LIBOR moves),
on $60 million, which essentially means that the project will run at a
deficit of over 350 bps on $60 million for quite some time.

Then, if you add in the developer responsibility to pay HOA fees on 500+
units, each month, the exorbitant insurance and real estate tax costs, the
deficit balloons much like our national trade deficit.

Against this bleak backdrop, the partners (Hanns and my children's trustees)
see no valid reason to keep throwing good money after bad. We have invested
in excess of $16 Million dollars to date on this deal.

I know that you will point out that I have a personal guarantee for a
portion of the old mezz debt still outstanding. I am aware of that but
offer two points to consider in this regard: (1) if all interest paid to
date since the loan modification, added to insurance and taxes, is
calculated, a significant portion of that guarantee has been extinguished;
(2) more importantly and quite unfortunately, my pending divorce has in
essence "frozen" my liquid assets, in advance of a judicial ruling which
will provide my wife with the majority of my liquidity.

The project is quite complex and requires skilled developer oversight to
avoid the legal pitfalls embedded in Florida's condo statutes. Not
surprisingly, the legal bar has created a new niche, and we are beginning to
see ambulance chasing type activity by lawyers soliciting clients from
busted condo deals. This concerns us.

We stand ready to assist you in whatever manner you deem necessary and
appropriate, but at the same time, ask you to realize that we cannot
continue to fund the gaping deficits that appear each month on this project.

Please call me as soon as you are in a position to discuss this.

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

CORUS BANK, N.A., a national banking
association,

      Plaintiff,

vs.                                                        CASE NO. 08000587CI-013

FLORIDA LAND PARCELS, LLC, a Delaware limited
liability company, f/k/a Florida Land Parcels, L.P., a
Delaware limited partnership, PRE PROPERTY B., L.L.C.,
a Delaware limited liability company, as successor in interest
by merger with Lansbrook Cambridge Apartments, LLC, a
Delaware limited liability company, CARVILL LIMITED
PARTNERSHIP, a Delaware limited partnership, EDUARD
DE GUARDIOLA, H.E.L.P. REALTY, INC., a Florida
corporation, VILLAGES AT LANSBROOK PROPERTY
OWNERS ASSOCIATION, INC., a Florida not-for-profit
corporation, LANSBROOK VILLAGE CONDOMINIUM
ASSOCIATION, INC., a Florida not-for-profit corporation,
and LIFESTYLE CARPETS, INC., a Florida corporation,

      Defendants.
_____/

## AFFIDAVIT IN SUPPORT OF
## EMERGENCY MOTION FOR APPOINTMENT OF RECEIVER

STATE OF ILLINOIS
COUNTY OF COOK

      BEFORE ME, the undersigned authority, personally appeared Brian Brodeur, who, first

being duly sworn, deposes and says of his personal knowledge:

      1.    That I am Senior Vice President of Corus Bank, N.A., "Lender" under the Loan

Agreement, Notes, Mortgage and other loan documents (collectively, the "Loan Documents")

which form the basis of Plaintiff's claims herein.

      2.    That I have reviewed the books and records maintained by Plaintiff pertaining to

the aforesaid Loan Documents and all documents and correspondence related to the mortgage

loan which is secured by the real properties the subject matter of this action, and those books and records are maintained in the ordinary course of business.

3.    The property which secures the mortgage loan consists of 509 unsold condominium units owned by Defendants, Florida Land Parcels, LLC, Pre Property B, LLC, and Carvill Limited Partnership (hereinafter the "Borrower") together with personal property and fixtures located therein and related thereto (the "Property").

4.    The unsold units, along with 265 previously sold units, comprise a development known as Lansbrook Village located in Palm Harbor, Pinellas County, Florida.

5.    Borrower is in default of the obligations set forth in the Loan Documents and as of the date hereof owes Plaintiff $2,047,626.71 in unpaid interest, $121,594.74 in accrued late charges and $63,602,076.91 in unpaid principal. Further, Borrower has failed to deliver all financial information and reports due Plaintiff for January, 2008.

6.    There is no equity in the Property in favor of Borrower and the mortgage matures on March 30, 2008.

7.    The 2006 real property taxes were paid in part by Borrower under protest, but there is insufficient income being generated from rental of the Property to pay for the remainder of the 2006 taxes once the amount has been adjudicated, or to pay interest accruing on the mortgage loan, the 2007 real property taxes that become delinquent if not paid on or before March 31, 2008, and the necessary amounts to repair and maintain the Property.

8.    Further, Borrower has elected extremely high deductibles on its property insurance required under the Loan Documents in amounts it lacks either reserves or sufficient income to pay should the project suffer major damage, e.g., from a hurricane.

9.    Borrower has failed to pay certain vendors and service providers and a lien in favor of Defendant, Lifestyle Carpets, Inc., has already been filed of record and encumbers the

2

Property.

10.    Plaintiff has engaged consultants to conduct inspections of the Property. These inspections reflect substantial maintenance deficiencies, including $320,000.00 in deferred maintenance expenses, $76,000.00 in unpaid invoices related to common area amenities, utilities and services, $100,000.00 of appliance deficiencies to get units lease ready, and $600,000.00 to $700,000.00 in capital needs. True copies of the inspection summaries are attached hereto as Exhibit "A" and by reference incorporated herein.

11.    In addition, the common areas are not being maintained by Borrower, as evidenced by non-functioning water features, dead and unkempt landscaping and unpaved parking lots.

12.    Further, Plaintiff has received numerous inquiries and complaints from unit owners concerning Borrower's failure to maintain the Property, failure to provide any financial information concerning use of assessments collected by the condominium association that is completely controlled by the Borrower, concern over use of assessments for purposes other than maintenance of the common areas and complaints concerning a lack of security resulting in use of the common areas, including pools, by non-members and non-residents in Lansbrook Village.

13.    My review of the financial records delivered to Plaintiff by Borrower reflects confusing accounting for expenses of the condominium association. It is unclear what common area expenses are properly being charged to the association. Additionally, we have no knowledge whether converter reserves have been established as required by Florida law.

14.    On January 22, 2008, Plaintiff demanded turnover of all rents in accordance with Section 2.1 of the mortgage and Borrower has failed to do so. A true copy of this demand is attached hereto as Exhibit "B" and by reference incorporated herein.

15.    Pursuant to Section 6.3(b) of the mortgage, Borrower has consented to the

3

appointment of a receiver for all or any portion of the Property and the rents and proceeds

thereof, as a matter of right,.

16.    Plaintiff is in immediate need of the appointment of a receiver to preserve the

value of its collateral and avoid further waste and deterioration thereof.

FURTHER AFFIANT SAYETH NOT

_B. Brodeur_____
Affiant

The foregoing instrument was sworn to and acknowledged before me this 3rd day of
_March_, 2008, by Brian Brodeur, as Senior Vice President of Corus Bank, N.A., on
behalf of the bank, who is personally known to me.

(affix notary seal)

_Rose Odeshoo_____

Notary Public-State of ___ILLINOIS_____
Commission Number: ___296558_____

# 5155345_v3

"OFFICIAL SEAL"
ROSE ODESHOO
NOTARY PUBLIC STATE OF ILLINOIS
My Commission Expires 09/12/2010

4

## Skelton, Patrick (TPA - X36436)

From:     Jackie Impellitier [jfi@ZOMUSA.com]
Sent:     Friday, January 11, 2008 12:57 AM
To:       Brian Brodeur
Subject:  Lansbrook Property Inspection

Brian-

As requested, you will find a few bullet points below with "ballpark" figures regarding some of the items discussed earlier. A due diligence package will be shipped out Friday which will include other detailed information as well as reports and inspection sheets from the visit. I can't stress enough that the information provided is merely an estimate of deferred expenses based on the findings from our limited visit.

- Aged Payables report from developer entity indicates roughly $185,000 in unpaid invoices primarily related to apartment turnover, repairs and marketing expenses. This does not include the undetermined number of invoices that remain at the property unprocessed.
- Aged Payables from the association entity indicates roughly $76,000 in unpaid invoices related to common area amenities, utilities and services. Again, this figure does not include any unprocessed invoices that remain at the site.

- Aged Receivables report (developer entity) does not show serious delinquent accounts that are in arrears more than 30 days however the current delinquent amount is about $24,000.
- Aged Receivable report (association entity) shows close to $40,000 in unpaid assessments. The manager handling the association records indicated that most of the delinquency is related to 15 foreclosure units. ZOM's licensed condo specialist advises that a condo attorney will need to file an answer with the courts for each foreclosure to ensure the association is paid out once foreclosure is finalized.

Several units in Hamptons Phase suffer from mold & mildew due to common area piping, plumbing and moisture control issues according to current manager. Specifically mentioned, Building #3 has experienced ongoing pluming and piping back up issues. It was not determined during our visit what the exact source of the problem is. Of the units inspected in this phase, none were noted to have active mold and mildew damage.

Deferred maintenance/upkeep as well as necessary capital projects were noted in several areas throughout the property- see below.

| Lansbrook Village | Amount | |
|---|---|---|
| Exterior Building | NA | Visual inspection found exterior, balcony/patios, entry doors, in operable condition with no visual signs of deferred maintenance. |
| Landscaping | $25,000 | Replacement of sod throughout 3 phases. Estimate only- recommend thorough inspection from Landscape company followed by proposal. |
| Landscaping | $45,000 | Landscaping improvements for entrances of all 3 phases to include plant shrub and annual replacements. Estimate only- recommend thorough inspection from Landscape company followed by proposal. |
| Landscaping | $20,000 | Mulch Amenity, Clubhouse, Pool and perimeters- Estimate only- recommend thorough inspection from Landscape company followed by proposal. |
| Landscaping | $10,000 | Cambridge Phase complete tree trimming for light clearance, sign clear and building visibility. Estimate only- recommend thorough inspection fr Landscape company followed by proposal. |
| Paving/Sidewalks/Curb | $35,000 | Resurface parking area per phase- Estimate Only. |

**EXHIBIT**

"A"

This fax was received by GFI FAXmaker fax server. For more information, visit http://www.gfi.com

| Fire Alarm System | $9,000 | Inspection and recertification of fire extinguishers, flush hydrants and te sprinkler systems. Estimate based on current manager proposal. |
| Fountains | 28,000 | New motor needed for fountain at main entrance, pump replacement ar interactive fountain repair. Estimates based on current manager propos |
| Tennis Courts | $7,000 | Resurfacing- estimate only. |
| Golf Carts | NA | 15 total golf carts between office and maintenance. 3 inoperable for rea unknown. |
| Carpet Replacement | $60,000 | Based on walking vacants all 60 need new carpet. It is apparent that th units in reasonably good condition were turned over and leased first lea all other units with major replacement or repair issues secondary. Carp replacement average of $1,200 per unit. |

Jackie Impellitier

Operations Manager

ZOM Residential Services, Inc.

1950 Summit Park Drive, Suite 300

Orlando, FL 32810

Tel:  407.644.6300 ext. 3029

Fax: 407.754.3107

E-Mail: jfi@zomusa.com

Website: www.zomusa.com

3/3/2008

Skelton, Patrick (TPA - X36436)

| | |
|---|---|
| **From:** | Wayne Blaylock [wblaylock@rfl-consulting.com] |
| **Sent:** | Monday, January 07, 2008 12:33 PM |
| **To:** | 'John Zander' |
| **Cc:** | 'Erica Kazlmlr'; Brian Brodeur; rlovejoy@rfl-consulting.com |
| **Subject:** | Draft Lansbrook Comments |
| **Attachments:** | DeGuardiola Unit Status 12-27-07 - (with RFL Comments).xls |

Good morning All~

Please find attached a draft summary of the inventory validation we performed at Lansbrook Village Condominiums. Note we have expanded the Unsold Unit Report provided by the Borrower to include our comments/information. RFL's column one indicates the units surveyed and totals 106 units or approximately 35 per each of the products. Column two indicates the units which have been upgraded with granite tops, stainless steel appliances, new light fixtures, and a range of decorator wall finishes. The third column indicates the status, i.e. ready for sale or rent, rented, and need for repairs. Ready and rented is self-explanatory; however, the term "need for repairs" may represent a range of issues. As an example,

- Units which were at some stage of completion at the time work was suspended (December 2006?) may have been painted with little or no care for the existing carpet as its replacement was anticipated; therefore, the replacement of the carpet and the concomitant repairs/touch-up as a result of carpet replacement must still be completed.
- In some cases, the appliance are in disarray – stoves needing new elements, refrigerators likely requiring replacement, washers and dryers with unknown operating status – as it was Maintenance's protocol to inspect those as a part of the final cleaning/make-ready.
- In the Windsor product, many of the cabinet door and drawer faces are vinyl-veneered and delaminating.
- There are instances where completed units have been returned to the rental roll and as a result the once-decorator wall finishes have now been painted white.

As a part of our survey, RFL was provided a copy of the Rent Roll, dated 11/30/2007 and the Maintenance Supervisor's Make Ready Status worksheet. Based on this site visit and detailed review of the documentation, RFL has a high confidence level that the information provided is reasonably accurate.

With this in mind, given the condition of the units observed and certain assumptions made, RFL assumes the cost to do the necessary repairs to make-ready the vacant units is in the range of $100,000.

Lastly, RFL noted staffing has been adjusted consistent with the current activities. The day-to-day operation is managed by the Property Manager, Karen Cruz, and her assistant, Donna. John Soucy, the Maintenance Supervisor has two maintenance engineers doing routine maintenance along with directing various subcontractors and vendors as required for painting, carpet installation, etc. There is a marketing manager, who was not available to interview but I wanted to comment she is on staff.

We are certain you will have some questions. Feel free to contact me via cell phone as I will be hopping a flight later this afternoon.

*K. Wayne Blaylock*

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

RFL Consulting Solutions, LLC
Ofc: 407.443.3423
Fax: 407.612.6300
Cell: 407.491.9051

CONFIDENTIALITY: This email (including any attachments) may contain confidential, proprietary and privileged information, and unauthorized disclosure or use is prohibited. If you received this email in error, please notify the sender and delete this email from your system.

This e-mail message and any files transmitted with it contain
confidential information intended only for the person(s) to whom this e-mail
message is addressed. If you have received this e-mail message in error,
please notify the sender immediately and do not disseminate, distribute
or copy this e-mail.

**Lansbrook Condominiums**

| Summary: | Cambridge | Somerset | Windsor | Total |
|---|---|---|---|---|
| Sold/Closed Units | 62 | 48 | 131 | 245 |
| Unsold Units (Current Collateral) | 174 | 174 | 131 | 509 |
| Totals | 306 | 194 | 249 | 774 |

| Unsold Units | | | | | | SOLVED | WORKED | |
|---|---|---|---|---|---|---|---|---|
| Unit Chart | Project Name | Building | Unit | Plan | SF | STATUS | | | STATUS |
| 1 | Cambridge | 1 | 101 | 1BR/1BA | 833 | Vacant | | | Rented |
| 2 | Cambridge | 1 | 102 | 1BR/1BA | 833 | Vacant | | | Rented |
| 3 | Cambridge | 1 | 104 | 1BR/1BA | 833 | Vacant | | | Rented |
| | Cambridge | 1 | 105 | 1BR/1BA | 833 | | X | X | Rented |

*(remainder of table illegible)*

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

| Lakebrook Condominiums | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Summary: | | Cambridge | Hunters | Windsor | Total | | | | |
| Sold/Closed Units | | 67 | 80 | 121 | 268 | | | | |
| Unsold Units (Current Collateral) | | 173 | 154 | 137 | 509 | | | | |
| Totals | | 146 | 234 | 258 | 774 | | | | |
| Unsold Units: | | | | | | | [redacted] | | |
| Unit Count | Project Name | Building | Unit | Plan | SF | STATUS | SURVEYED | UPGRADES | STATUS |
| 84 | Cambridge | 12 | 203 | 1BR/2BA/Loft | 1,464 | Vacant | | | Rented |
| 85 | Cambridge | 13 | 101 | 2BR/2BA | 1,314 | Vacant | | | Ready |
| 86 | Cambridge | 13 | 103 | 3BR/2BA | 1,314 | Vacant | | | Ready |
| 87 | Cambridge | 13 | 104 | 2BR/2BA | 1,314 | Vacant | | | Rented |
| 88 | Cambridge | 13 | 201 | 1BR/2BA/Loft | 1,464 | Vacant | X | | Ready |
| 89 | Cambridge | 13 | 203 | 1BR/2BA/Loft | 1,464 | Vacant | | | Rented |
| 90 | Cambridge | 13 | 204 | 1BR/2BA/Loft | 1,464 | Vacant | | | Rented |
| 91 | Cambridge | 14 | 102 | 2BR/2BA | 1,144 | Vacant | X | | Ready |
| 92 | Cambridge | 14 | 104 | 2BR/2BA | 1,144 | [redacted] | X | X | Needs Washer & Dryer |
| 93 | Cambridge | 14 | 201 | 2BR/2BA/Loft | 1,350 | Vacant | | | Ready |
| 94 | Cambridge | 14 | 202 | 2BR/2BA/Loft | 1,350 | Vacant | | | Rented |
| 95 | Cambridge | 14 | 204 | 1BR/2BA/Loft | 1,350 | Vacant | | | Rented |
| 96 | Cambridge | 15 | 101 | 2BR/2BA | 1,144 | Vacant | | | Ready |
| 97 | Cambridge | 15 | 102 | 3BR/2BA | 1,314 | Vacant | | | Needs Repairs |
| 98 | Cambridge | 15 | 104 | 2BR/2BA | 1,148 | Vacant | X | | Needs Repairs |
| 99 | Cambridge | 15 | 201 | 3BR/2BA/Loft | 1,500 | Vacant | | | Rented |
| 100 | Cambridge | 15 | 202 | 3BR/2BA/Loft | 1,456 | Vacant | | | Rented |
| 101 | Cambridge | 15 | 204 | 3BR/2BA/Loft | 1,500 | [redacted] | X | X | Ready |
| 102 | Cambridge | 16 | 101 | 3BR/2BA | 1,314 | Vacant | | | Rented |
| 103 | Cambridge | 16 | 102 | 3BR/2BA | 1,314 | [redacted] | | | Ready |
| 104 | Cambridge | 16 | 104 | 3BR/2BA | 1,314 | [redacted] | X | X | Ready |
| 105 | Cambridge | 16 | 201 | 1BR/2BA/Loft | 1,464 | Vacant | | | Rented |
| 106 | Cambridge | 16 | 202 | 1BR/2BA/Loft | 1,464 | Vacant | | | Rented |
| 107 | Cambridge | 16 | 203 | 1BR/2BA/Loft | 1,456 | Vacant | X | | Needs Repairs |
| 108 | Cambridge | 16 | 204 | 1BR/2BA/Loft | 1,456 | Vacant | | | Ready |
| 109 | Cambridge | 17 | 103 | 4BR/2BA | 1,471 | Vacant | | | Rented |
| 110 | Cambridge | 17 | 104 | 3BR/2BA | 1,314 | Vacant | | | Rented |
| 111 | Cambridge | 17 | 201 | 1BR/2BA/Loft | 1,464 | Vacant | | | Rented |
| 112 | Cambridge | 17 | 202 | 4BR/2BA/Loft | 1,630 | Vacant | | | Rented |
| 113 | Cambridge | 17 | 203 | 4BR/2BA/Loft | 1,630 | Vacant | | | Rented |
| 114 | Cambridge | 17 | 204 | 1BR/2BA/Loft | 1,464 | Vacant | | | Rented |
| 115 | Cambridge | 18 | 101 | 3BR/2BA | 1,314 | [redacted] | | X | Needs Repairs |
| 116 | Cambridge | 18 | 102 | 4BR/2BA | 1,471 | Vacant | | | Rented |
| 117 | Cambridge | 18 | 103 | 4BR/2BA | 1,471 | Vacant | | | Rented |
| 118 | Cambridge | 18 | 104 | 3BR/2BA | 1,314 | Vacant | | | Rented |
| 119 | Cambridge | 18 | 201 | 1BR/2BA/Loft | 1,464 | Vacant | X | | Needs Repairs |
| 120 | Cambridge | 18 | 202 | 4BR/2BA/Loft | 1,630 | Vacant | | | Rented |
| 121 | Cambridge | 18 | 203 | 4BR/2BA/Loft | 1,630 | Vacant | X | | Ready |
| 122 | Cambridge | 18 | 204 | 1BR/2BA/Loft | 1,464 | Vacant | | | Rented |
| 123 | Cambridge | 19 | 102 | 2BR/2BA | 1,144 | Vacant | | | Needs Repairs |
| 124 | Cambridge | 19 | 104 | 1BR/1BA | 833 | Vacant | | | Ready |
| 125 | Cambridge | 19 | 201 | 1BR/1BA/Loft | 985 | Vacant | | | Rented |
| 126 | Cambridge | 19 | 203 | 1BR/2BA/Loft | 1,300 | Vacant | | | Rented |
| 127 | Cambridge | 19 | 204 | 1BR/1BA/Loft | 985 | [redacted] | | X | Needs Repairs |
| 128 | Cambridge | 20 | 101 | 3BR/2BA | 1,314 | Vacant | | | Rented |
| 129 | Cambridge | 20 | 104 | 3BR/2BA | 1,314 | Vacant | | | Rented |
| 130 | Cambridge | 20 | 201 | 1BR/2BA/Loft | 1,464 | Vacant | | | Rented |
| 131 | Cambridge | 20 | 204 | 1BR/2BA/Loft | 1,464 | Vacant | X | | Ready |
| 132 | Cambridge | 21 | 101 | 1BR/1BA | 833 | Vacant | | | Rented |
| 133 | Cambridge | 21 | 102 | 2BR/2BA | 1,148 | Vacant | | | Rented |
| 134 | Cambridge | 21 | 103 | 2BR/2BA | 1,148 | Vacant | | | Ready |
| 135 | Cambridge | 21 | 104 | 1BR/1BA | 833 | Vacant | | | Ready |
| 136 | Cambridge | 21 | 201 | 1BR/1BA/Loft | 985 | [redacted] | | X | Ready |
| 137 | Cambridge | 21 | 202 | 1BR/2BA/Loft | 1,300 | Vacant | | | Rented |
| 138 | Cambridge | 21 | 203 | 1BR/2BA/Loft | 1,300 | Vacant | X | | Ready |
| 139 | Cambridge | 22 | 103 | 1BR/1BA | 833 | Vacant | | | Ready |
| 140 | Cambridge | 22 | 104 | 1BR/1BA | 833 | Vacant | | | Rented |
| 141 | Cambridge | 22 | 102 | 2BR/2BA | 1,148 | Vacant | | | Ready |
| 142 | Cambridge | 22 | 101 | 1BR/1BA | 833 | Vacant | | | Ready |
| 143 | Cambridge | 22 | 204 | 1BR/1BA/Loft | 985 | Vacant | X | | Ready |
| 144 | Cambridge | 22 | 203 | 1BR/2BA/Loft | 1,300 | Vacant | | | Rented |
| 145 | Cambridge | 22 | 201 | 1BR/1BA/Loft | 985 | Vacant | | | Ready |
| 146 | Cambridge | 23 | 101 | 1BR/1BA | 833 | [redacted] | | X | Ready |
| 147 | Cambridge | 23 | 102 | 2BR/2BA | 1,148 | [redacted] | | X | Needs Repairs |
| 148 | Cambridge | 23 | 103 | 1BR/1BA | 833 | Vacant | | | Ready |
| 149 | Cambridge | 23 | 104 | 1BR/1BA | 833 | Vacant | | | Ready |
| 150 | Cambridge | 23 | 105 | 2BR/2BA | 1,148 | Vacant | | | Rented |
| 151 | Cambridge | 23 | 106 | 1BR/1BA | 833 | Vacant | | | Rented |
| 152 | Cambridge | 23 | 201 | 1BR/1BA/Loft | 985 | Vacant | | | Rented |
| 153 | Cambridge | 23 | 203 | 1BR/2BA/Loft | 1,300 | Vacant | X | | Ready |
| 154 | Cambridge | 23 | 202 | 1BR/1BA/Loft | 985 | Vacant | | | Rented |
| 155 | Cambridge | 23 | 204 | 1BR/1BA/Loft | 985 | Vacant | | | Rented |
| 156 | Cambridge | 23 | 205 | 1BR,2BA/Loft | 1,300 | Vacant | X | | Ready |
| 157 | Cambridge | 23 | 206 | 1BR/1BA/Loft | 985 | Vacant | | | Ready |
| 158 | Cambridge | 24 | 101 | 1BR/1BA | 833 | Vacant | | | Ready |
| 159 | Cambridge | 24 | 102 | 2BR/2BA | 1,148 | Vacant | | | Rented |
| 160 | Cambridge | 24 | 103 | 2BR/2BA | 1,148 | Vacant | X | | Ready |
| 161 | Cambridge | 24 | 201 | 1BR/1BA/Loft | 985 | Vacant | | | Rented |
| 162 | Cambridge | 24 | 202 | 1BR/2BA/Loft | 1,300 | Vacant | | | Rented |
| 163 | Cambridge | 24 | 204 | 1BR/1BA/Loft | 985 | Vacant | | | Rented |
| 164 | Cambridge | 25 | 101 | 1BR/1BA | 833 | Vacant | | | Rented |
| 165 | Cambridge | 25 | 102 | 2BR/2BA | 1,148 | Vacant | | | Rented |
| 166 | Cambridge | 25 | 104 | 1BR/1BA | 833 | Vacant | | | |

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

From  TPA3817    Page: 33/61    Date: 3/4/2008 4:26...

**Lansbrook Condominiums**

| Summary | Cambridge | Rampton | Windsor | Total | | | |
|---|---|---|---|---|---|---|---|
| Total Closed Units | 41 | 43 | 125 | 343 | | | |
| Unsold Units (Current Collateral) | 196 | 174 | 127 | 309 | | | |
| Totals | 148 | 184 | 234 | 774 | | | |

| Unsold Units | | | | | | CURRENT CONSTRUCTION STATUS | | |
|---|---|---|---|---|---|---|---|---|
| Unit Count | Project Name | Building | Unit | Plan | SF | STATUS | RENOVATED | UPGRADED | STATUS |
| 167 | Cambridge | 25 | 101 | 3BR/2BA | 1,148 | Vacant | X | | Ready |
| 168 | Cambridge | 25 | 201 | 1BR/1BA/Loft | 893 | Vacant | | | Rented |
| 169 | Cambridge | 25 | 202 | 1BR/1BA/Loft | 893 | Vacant | | | Ready |
| 170 | Cambridge | 25 | 204 | 1BR/1BA/Loft | 893 | Vacant | | | Ready |
| 171 | Cambridge | 25 | 305 | 2BR/2BA/Loft | 1,300 | Vacant | | | Rented |
| 172 | Cambridge | 25 | 305 | 1BR/1BA/Loft | 863 | Vacant | | | Rented |
| 173 | Cambridge | 26 | 101 | 2BR/2BA | 1,148 | Vacant | | | Rented |
| 174 | Cambridge | 26 | 102 | 1BR/1BA | 835 | Under Renovation | X | X | Ready |
| 175 | Cambridge | 26 | 104 | 3BR/2BA | 1,148 | Vacant | X | | Ready |
| 176 | Cambridge | 26 | 201 | 1BR/2BA/Loft | 893 | Under Renovation | | X | Needs Repairs |
| 177 | Cambridge | 26 | 204 | 1BR/1BA/Loft | 863 | Vacant | | | Rented |
| 178 | Cambridge | 25 | 305 | 2BR/2BA/Loft | 1,300 | Vacant | | | Rented |
| 179 | Rampton | 1 | 101 | 2BR/2BA | 1,174 | Vacant | | | Ready |
| 180 | Rampton | 1 | 102 | 2BR/1BA | 944 | Vacant | | | Rented |
| 181 | Rampton | 1 | 104 | 2BR/1BA | 944 | Vacant | | | Rented |
| 182 | Rampton | 1 | 106 | 1BR/1BA | 640 | Vacant | X | | Ready |
| 183 | Rampton | 1 | 107 | 1BR/1BA | 644 | Vacant | | | Rented |
| 184 | Rampton | 1 | 201 | 2BR/2BA | 1,174 | Vacant | | | Rented |
| 185 | Rampton | 1 | 201 | 2BR/2BA | 1,060 | Vacant | | | Rented |
| 186 | Rampton | 1 | 202 | 2BR/1BA | 944 | Vacant | | | Rented |
| 187 | Rampton | 1 | 204 | 1BR/1BA | 644 | Vacant | | | Rented |
| 188 | Rampton | 1 | 206 | 1BR/1BA | 644 | Vacant | | | Ready |
| 189 | Rampton | 1 | 207 | 2BR/2BA | 648 | Vacant | | | Rented |
| 190 | Rampton | 1 | 301 | 2BR/2BA | 1,064 | Vacant | | | Ready |
| 191 | Rampton | 1 | 304 | 1BR/1BA | 648 | Under Renovation | X | | Ready |
| 192 | Rampton | 1 | 304 | 2BR/1BA | 944 | Vacant | | | Rented |
| 193 | Rampton | 1 | 306 | 1BR/1BA | 644 | Vacant | | | Rented |
| 194 | Rampton | 1 | 307 | 2BR/2BA | 1,648 | Vacant | | | Rented |
| 195 | Rampton | 2 | 101 | 2BR/2BA | 1,174 | Vacant | | | Rented |
| 196 | Rampton | 4 | 106 | 1BR/1BA | 644 | Vacant | | | Rented |
| 197 | Rampton | 4 | 106 | 2BR/2BA | 1,064 | Vacant | | | Rented |
| 198 | Rampton | 4 | 201 | 2BR/2BA | 1,440 | Vacant | X | | Ready |
| 199 | Rampton | 4 | 201 | 2BR/1BA | 944 | Vacant | X | | Ready |
| 200 | Rampton | 4 | 301 | 2BR/2BA | 1,064 | Vacant | | | Rented |
| 201 | Rampton | 4 | 301 | 2BR/2BA | 1,091 | Vacant | | | Rented |
| 202 | Rampton | 6 | 102 | 2BR/1BA | 1,091 | Vacant | | | Rented |
| 203 | Rampton | 6 | 107 | 2BR/1BA | 1,081 | Vacant | | | Rented |
| 204 | Rampton | 6 | 101 | 2BR/2BA | 1,091 | Vacant | X | | Ready |
| 205 | Rampton | 6 | 202 | 1BR/1BA | 1,091 | Vacant | | | Rented |
| 206 | Rampton | 6 | 204 | 1BR/1BA | 806 | Vacant | | | Rented |
| 207 | Rampton | 6 | 206 | 1BR/1BA | 806 | Vacant | | | Rented |
| 208 | Rampton | 6 | 301 | 2BR/2BA | 800 | Vacant | | | Rented |
| 209 | Rampton | 6 | 307 | 2BR/2BA | 1,091 | Vacant | | | Rented |
| 210 | Rampton | 6 | 308 | 2BR/2BA | 1,061 | Vacant | | | Rented |
| 211 | Rampton | 6 | 301 | 2BR/2BA | 1,091 | Vacant | X | | Ready |
| 212 | Rampton | 6 | 301 | 2BR/2BA | 1,091 | Vacant | X | | Rented |
| 213 | Rampton | 6 | 301 | 2BR/2BA | 800 | Vacant | | | Rented |
| 214 | Rampton | 6 | 302 | 1BR/1BA | 640 | Vacant | | | Rented |
| 215 | Rampton | 6 | 303 | 2BR/1BA | 800 | Vacant | | | Rented |
| 216 | Rampton | 6 | 306 | 1BR/1BA | 800 | Vacant | | | Rented |
| 217 | Rampton | 6 | 307 | 2BR/2BA | 1,091 | Vacant | | | Ready |
| 218 | Rampton | 6 | 308 | 2BR/2BA | 1,091 | Vacant | X | | Ready |
| 219 | Rampton | 7 | 101 | 2BR/2BA | 1,174 | Under Renovation | X | | Ready |
| 220 | Rampton | 7 | 102 | 2BR/2BA | 1,464 | Vacant | X | | Rented |
| 221 | Rampton | 7 | 106 | 1BR/1BA | 1,081 | Vacant | | | Ready |
| 222 | Rampton | 7 | 107 | 2BR/1BA | 1,444 | Vacant | | | Ready |
| 223 | Rampton | 7 | 201 | 2BR/2BA | 1,174 | Vacant | X | | Ready |
| 224 | Rampton | 7 | 202 | 2BR/1BA | 1,174 | Vacant | X | | Rented |
| 225 | Rampton | 7 | 204 | 1BR/1BA | 644 | Vacant | | | Needs Repairs |
| 226 | Rampton | 9 | 106 | 1BR/1BA | 1,064 | Vacant | X | | Ready |
| 227 | Rampton | 9 | 107 | 2BR/2BA | 1,448 | Vacant | | | Ready |
| 228 | Rampton | 9 | 107 | 2BR/1BA | 1,174 | Under Renovation | X | | Ready |
| 229 | Rampton | 9 | 201 | 2BR/2BA | 1,064 | Vacant | | | Rented |
| 230 | Rampton | 10 | 101 | 2BR/2BA | 1,081 | Vacant | | | Rented |
| 231 | Rampton | 10 | 102 | 1BR/1BA | 1,081 | Vacant | | | Rented |
| 232 | Rampton | 10 | 103 | 2BR/2BA | 800 | Vacant | | | Rented |
| 233 | Rampton | 10 | 104 | 1BR/1BA | 800 | Vacant | | | Rented |
| 234 | Rampton | 10 | 106 | 2BR/1BA | 1,091 | Vacant | | | Rented |
| 235 | Rampton | 10 | 107 | 2BR/2BA | 1,091 | Under Renovation | X | | Rented |
| 236 | Rampton | 10 | 201 | 1BR/1BA | 800 | Vacant | | | Ready |
| 237 | Rampton | 10 | 204 | 1BR/1BA | 800 | Vacant | | | Ready |
| 238 | Rampton | 10 | 301 | 2BR/1BA | 806 | Vacant | | | Rented |
| 239 | Rampton | 10 | 304 | 1BR/1BA | 800 | Vacant | | | Rented |
| 240 | Rampton | 10 | 307 | 2BR/2BA | 1,081 | Vacant | | | Rented |
| 241 | Rampton | 10 | 301 | 2BR/2BA | 1,091 | Vacant | | | Rented |
| 242 | Rampton | 10 | 301 | 2BR/2BA | 1,061 | Vacant | | | Rented |
| 243 | Rampton | 10 | 301 | 2BR/2BA | 800 | Vacant | | | Rented |
| 244 | Rampton | 10 | 302 | 1BR/1BA | 800 | Vacant | | | Rented |
| 245 | Rampton | 10 | 307 | 2BR/2BA | 800 | Vacant | | | Rented |
| 246 | Rampton | 10 | 308 | 2BR/2BA | 1,091 | Vacant | | | Ready |
| 247 | Rampton | 11 | 101 | 2BR/2BA | 1,081 | Vacant | X | | Needs Repairs |
| 248 | Rampton | 11 | 102 | 1BR/1BA | 648 | Vacant | | | Rented |
| 249 | Rampton | 11 | 102 | 1BR/1BA | 644 | Vacant | | | Rented |

Lansbrook Condominiums

| Summary: | Cambridge | Hampton | Windsor | Total |
|---|---|---|---|---|
| Sold/Closed Units | 62 | 60 | 123 | 245 |
| Unsold Units (Current Collateral) | 178 | 174 | 137 | 503 |
| Totals: | 240 | 234 | 260 | 774 |

Unsold Units

| Unit Count | Project Name | Building | Unit | Size | SF | STATUS | SURVEYED | UPGRADED | STATUS |
|---|---|---|---|---|---|---|---|---|---|
| 250 | Hampton | 11 | 106 | 3BR/2BA | 1,468 | Vacant | | | Needs Repairs |
| 251 | Hampton | 11 | 107 | 1BR/1BA | 844 | Vacant | X | | Ready |
| 252 | Hampton | 11 | 108 | 3BR/2BA | 1,468 | Vacant | | | Needs Repairs |
| 253 | Hampton | 11 | 109 | 2BR/2BA | 1,174 | Vacant | | | Needs Repairs |
| 254 | Hampton | 12 | 101 | 2BR/2BA | 1,160 | Vacant | | | Rented |
| 255 | Hampton | 12 | 102 | 2BR/2BA | 1,160 | Vacant | | | Rented |
| 256 | Hampton | 12 | 103 | 1BR/1BA | 800 | Vacant | | | Rented |
| 257 | Hampton | 12 | 104 | 1BR/1BA | 800 | Vacant | | | Rented |
| 258 | Hampton | 12 | 105 | 1BR/1BA | 800 | Vacant | | | Rented |
| 259 | Hampton | 12 | 106 | 1BR/1BA | 800 | Vacant | | | Rented |
| 260 | Hampton | 12 | 107 | 2BR/2BA | 1,160 | Vacant | X | | Ready |
| 261 | Hampton | 12 | 108 | 2BR/2BA | 1,160 | Vacant | | | Rented |
| 262 | Hampton | 12 | 201 | 2BR/2BA | 1,160 | Vacant | | | Rented |
| 263 | Hampton | 12 | 202 | 2BR/2BA | 1,160 | Vacant | | | Rented |
| 264 | Hampton | 12 | 203 | 1BR/1BA | 800 | Vacant | | | Rented |
| 265 | Hampton | 12 | 204 | 1BR/1BA | 800 | Vacant | | | Ready |
| 266 | Hampton | 12 | 205 | 1BR/1BA | 800 | Vacant | X | | Ready |
| 267 | Hampton | 12 | 207 | 2BR/2BA | 1,160 | Vacant | | | Rented |
| 268 | Hampton | 12 | 208 | 2BR/2BA | 1,160 | Vacant | | | Rented |
| 269 | Hampton | 12 | 301 | 2BR/2BA | 1,160 | Vacant | | | Rented |
| 270 | Hampton | 12 | 302 | 2BR/2BA | 1,160 | Vacant | | | Rented |
| 271 | Hampton | 12 | 304 | 1BR/1BA | 800 | Vacant | | | Rented |
| 272 | Hampton | 12 | 305 | 1BR/1BA | 800 | Vacant | | | Rented |
| 273 | Hampton | 12 | 306 | 1BR/1BA | 800 | Vacant | | | Rented |
| 274 | Hampton | 13 | 103 | 3BR/2BA | 1,468 | Vacant | | | Rented |
| 275 | Hampton | 13 | 104 | 1BR/1BA | 844 | Vacant | X | | Needs Repairs |
| 276 | Hampton | 13 | 105 | 2BR/2BA | 1,174 | Vacant | | | Ready |
| 277 | Hampton | 14 | 101 | 3BR/2BA | 1,468 | Vacant | | | Rented |
| 278 | Hampton | 14 | 102 | 2BR/2BA | 1,174 | Vacant | | | Rented |
| 279 | Hampton | 14 | 104 | 1BR/1BA | 844 | Vacant | | | Ready |
| 280 | Hampton | 14 | 105 | 1BR/1BA | 844 | Vacant | | | Rented |
| 281 | Hampton | 15 | 101 | 2BR/2BA | 1,064 | Vacant | | | Rented |
| 282 | Hampton | 15 | 102 | 2BR/2BA | 1,174 | Vacant | | | Rented |
| 283 | Hampton | 15 | 104 | 1BR/1BA | 844 | Vacant | | | Rented |
| 284 | Hampton | 15 | 106 | 3BR/2BA | 1,468 | Vacant | X | | Ready |
| 285 | Hampton | 15 | 108 | 3BR/2BA | 1,468 | Vacant | X | | Ready |
| 286 | Hampton | 16 | 104 | 1BR/1BA | 800 | Vacant | | | Rented |
| 287 | Hampton | 16 | 105 | 1BR/1BA | 800 | Vacant | | | Ready |
| 288 | Hampton | 16 | 106 | 1BR/1BA | 800 | [illegible] | | Model | Rented |
| 289 | Hampton | 16 | 107 | 2BR/2BA | 1,091 | Vacant | | | Ready |
| 290 | Hampton | 16 | 108 | 2BR/2BA | 1,091 | Vacant | X | | Rented |
| 291 | Hampton | 16 | 201 | 2BR/2BA | 1,091 | Vacant | | | Rented |
| 292 | Hampton | 16 | 202 | 2BR/2BA | 1,091 | Vacant | | | Rented |
| 293 | Hampton | 16 | 203 | 1BR/1BA | 800 | Vacant | | | Rented |
| 294 | Hampton | 16 | 204 | 1BR/1BA | 800 | Vacant | | | Rented |
| 295 | Hampton | 16 | 205 | 1BR/1BA | 800 | Vacant | | | Rented |
| 296 | Hampton | 16 | 206 | 1BR/1BA | 800 | Vacant | | | Rented |
| 297 | Hampton | 16 | 207 | 2BR/2BA | 1,091 | Vacant | | | Rented |
| 298 | Hampton | 16 | 301 | 2BR/2BA | 1,091 | Vacant | | | Rented |
| 299 | Hampton | 16 | 302 | 2BR/2BA | 1,091 | Vacant | X | | Ready |
| 300 | Hampton | 16 | 303 | 1BR/1BA | 800 | Vacant | | | Rented |
| 301 | Hampton | 16 | 304 | 1BR/1BA | 800 | Vacant | | | Rented |
| 302 | Hampton | 16 | 306 | 1BR/1BA | 800 | Vacant | | | Rented |
| 303 | Hampton | 16 | 307 | 2BR/2BA | 1,091 | Vacant | | | Rented |
| 304 | Hampton | 16 | 308 | 2BR/2BA | 1,091 | Vacant | | | Rented |
| 305 | Hampton | 17 | 103 | 2BR/2BA | 1,174 | Vacant | | | Rented |
| 306 | Hampton | 17 | 104 | 1BR/1BA | 844 | Vacant | | | Rented |
| 307 | Hampton | 17 | 105 | 1BR/1BA | 844 | Vacant | | | Needs Repairs |
| 308 | Hampton | 17 | 106 | 3BR/2BA | 1,468 | Vacant | | | Rented |
| 309 | Hampton | 17 | 107 | 2BR/2BA | 1,174 | Vacant | | | Rented |
| 310 | Hampton | 18 | 101 | 3BR/2BA | 1,468 | Vacant | X | | Needs Repairs |
| 311 | Hampton | 18 | 102 | 2BR/2BA | 1,174 | Vacant | X | | Needs Repairs |
| 312 | Hampton | 18 | 103 | 3BR/2BA | 1,468 | Vacant | | | Rented |
| 313 | Hampton | 18 | 104 | 1BR/1BA | 844 | Vacant | | | Ready |
| 314 | Hampton | 18 | 105 | 1BR/1BA | 844 | Vacant | | | Rented |
| 315 | Hampton | 18 | 106 | 3BR/2BA | 1,468 | Vacant | | | Rented |
| 316 | Hampton | 18 | 108 | 2BR/2BA | 1,064 | Vacant | | | Rented |
| 317 | Hampton | 19 | 103 | 2BR/2BA | 1,174 | Vacant | | | Rented |
| 318 | Hampton | 19 | 102 | 3BR/2BA | 1,468 | Vacant | | | Needs Repairs |
| 319 | Hampton | 19 | 104 | 1BR/1BA | 844 | Vacant | | | Rented |
| 320 | Hampton | 19 | 105 | 2BR/2BA | 1,174 | Vacant | | | Rented |
| 321 | Hampton | 19 | 106 | 2BR/2BA | 1,064 | Vacant | | | Rented |
| 322 | Hampton | 20 | 101 | 2BR/2BA | 1,064 | Vacant | | | Needs Repairs |
| 323 | Hampton | 20 | 102 | 2BR/2BA | 1,174 | Vacant | X | | Rented |
| 324 | Hampton | 20 | 103 | 3BR/2BA | 1,468 | Vacant | | | Rented |
| 325 | Hampton | 20 | 104 | 1BR/1BA | 844 | Vacant | | | Rented |
| 326 | Hampton | 20 | 105 | 2BR/2BA | 1,174 | Vacant | X | | Needs Repairs |
| 327 | Hampton | 21 | 103 | 3BR/2BA | 1,468 | Vacant | | | Rented |
| 328 | Hampton | 21 | 106 | 1BR/1BA | 844 | Vacant | | | Needs Repairs |
| 329 | Hampton | 21 | 107 | 1BR/1BA | 844 | Vacant | | | Rented |
| 330 | Hampton | 21 | 108 | 3BR/2BA | 1,468 | Vacant | | | Ready |
| 331 | Hampton | 21 | 109 | 2BR/2BA | 1,174 | Vacant | X | | Rented |
| 332 | Hampton | 21 | 110 | 2BR/2BA | 1,064 | Vacant | | | |

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

**EXHIBIT D**
**2 of 2**

Landsbrook Condominiums

| Summary | Cambridge | Hampton | Windsor | Total | | | | |
|---|---|---|---|---|---|---|---|---|
| Sold/Closed Units | 69 | 92 | 125 | 116 | | | | |
| Unsold Units (Current Closings) | 179 | 154 | 197 | 530 | | | | |
| Totals | 256 | 256 | 330 | 774 | | | | |

| Unsold Units | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Unit Cross | Project Name | Building | Unit | Plan | SF | STATUS | RENOVATED | UPGRADE | STATUS |

**Lenbrook Condominiums**

| Summary: | Cambridge | Kiawah | Windsor | Total | | | | |
|---|---|---|---|---|---|---|---|---|
| Sold/Closed Units | 63 | 80 | 122 | 265 | | | | |
| Unsold Units (Current Collateral) | 176 | 174 | 183 | 509 | | | | |
| Totals: | 249 | 254 | 305 | 774 | | | | |

| Unsold Units: | | | | | | | SURVEYED | UPGRADED | STATUS |
|---|---|---|---|---|---|---|---|---|---|
| Unit Count | Project Name | Building | Unit | Plan | SF | STATUS | | | Needs Repairs |
| 499 | Windsor | 33 | 101 | 1 BR/1BA/Villa | 734 | Vacant | | | Apply |
| 500 | Windsor | 33 | 101 | 1BR/1.5BA/Villa | 1,266 | Vacant | | | Apply |
| 501 | Windsor | 33 | 101 | 3BR/2.5BA/Villa | 1,366 | Vacant | | | Apply |
| 502 | Windsor | 33 | 101 | 1BR/1.5BA/Villa | 132 | | | | Apply |
| 503 | Windsor | 39 | 101 | 3BR/2.5BA/Villa | 1,366 | Vacant | | | Apply |
| 504 | Windsor | 39 | 101 | 1BR/1BA/Villa | 721 | | | | Apply |
| 505 | Windsor | 40 | 101 | 3BR/2.5BA/Villa | 883 | Frame | X | | Needs Repairs |
| 506 | Windsor | 41 | 101 | 1BR/1BA/Villa | 934 | | | | Apply |
| 507 | Windsor | 41 | 102 | 2BR/2.5BA/Villa | 192 | Vacant | | | Apply |
| 508 | Windsor | 41 | 103 | 2BR/2.5BA/Villa | 1,660 | Vacant | | | Apply |
| 509 | Windsor | 41 | 104 | 3BR/2.5BA/Villa | 1,366 | Vacant | X | | Apply |
| TOTAL: | | | | | 549,313 | | 164 | | |

# Holland+Knight

Tel  813 227 8500
Fax 813 229 0134

Holland & Knight LLP
100 North Tampa Street, Suite 4100
Tampa, FL 33602-3644
www.hklaw.com

January 22, 2008

PATRICK W. SKELTON
813-227-6436

Internet Address
patrick.skelton@hklaw.com

<u>VIA UPS OVERNIGHT DELIVERY</u>

Vista Realty Partners
Attention: Eduard de Guardiola
One Midtown Plaza, Suite 1000
1360 Peachtree Street, NE
Atlanta, Georgia  30309

    RE:  Lansbrook Village Apartments
          Mortgage Loan Agreement Dated July 15, 2005
          Lender: Corus Bank, N.A.
          Borrower: Florida Land Parcels, L.L.C.
                Pre Property B., L.L.C.
                Carvill Limited Partnership

Dear Mr. Guardiola:

    Please be advised that this firm represents Corus Bank, N.A. ("Corus Bank") and this is written with respect to the above referenced mortgage loan. Corus Bank has initiated a mortgage foreclosure proceeding against the Borrower in the Circuit Court for Pinellas County, Florida, Case No. 08000587 CI-013 (the "pending litigation").

    In that regard, Corus Bank initiated the pending litigation due to Borrower's failure to make the entire interest payments due on November 1, 2007, and the entire interest payments due on the first day of each month thereafter. As such, Borrower is in default under the terms and conditions of the mortgage loan and Corus Bank, as owner and holder thereof, has accelerated the balance due so that all amounts required to be paid thereunder are now due and payable in full.



EXHIBIT
"B"

Vista Realty Partners
January 22, 2008
Page 2

As a consequence, and pursuant to the terms of the Amended and Restated Mortgage, Assignment of Rents, Security Agreement and Fixture Filing recorded July 21, 2005 in Official Records Book 14471, Pages 1968-1998 of the Public Records of Pinellas County, Florida (the "Mortgage"), and Fla. Stat. §697.07(3), this is to demand that all rents in your possession and those collected in the future on the premises securing the Mortgage be turned over to Corus Bank. Said rents include the sum of $220,064.27 that appears on your Summary of Excess Net Operating Income (the "Summary") for the period ending December 31, 2007, recently delivered to Corus Bank. Specifically, from a review of the Summary you have withhold payment of net rentals received by Borrower during December in the amount of $121,349.80 for Real Estate Taxes and $98,714.47 in Net Operating Income and purportedly placed those amounts in an unauthorized Real Estate Escrow. That escrowed, together with all future rents, should be remitted to the attention of Mr. Brian Brodeur, Senior Vice President, Corus Bank, N.A., 3959 North Lincoln Avenue, Chicago, Illinois 60613.

Your prompt attention to this demand is appreciated.

Sincerely,

HOLLAND & KNIGHT LLP

Patrick W. Skelton

cc:  Weissman, Nowack, Curry & Wilco, P.C.  (via UPS Overnight)
     HAP Equity Partners, LLC (via UPS Overnight)
     Arnall Golden Gregory LLP (via UPS Overnight)
     Joel C. Solomon, Corus Bank
     Brian Brodeur, Corus Bank

# 5071978 v1

# TABLE OF CONTENTS

1.  Turtle Lake Associates, LTD. v. Third Financial Services, Inc.,
    518 So. 2d 959 (Fla. 1st DCA 1988)

2.  Martarano v. Spicola,
    110 Fla. 55, 148 So. 585 (1933)

3.  Smith v. DuPuis,
    117 Fla. 222, 157 So. 491(1934)

4.  Florida Reinvestment Corp. v. Cypress Savings Ass'n.
    509 So. 2d 1352 (Fla. 4th DCA 1987)

5.  Atco Construction & Development Corp v. Beneficial Savings Bank, F.S.B.,
    523 So. 2d 747 (Fla. 5th DCA 1988)

# 5167664_v1

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Westlaw

523 So.2d 747
523 So.2d 747, 13 Fla. L. Weekly 942
(Cite as: 523 So.2d 747)

Page 1

CAtco Const. & Development Corp. v. Beneficial
Sav. Bank, F.S.B.
Fla.App. 5 Dist.,1988.

District Court of Appeal of Florida,Fifth District.
ATCO CONSTRUCTION & DEVELOPMENT
CORPORATION, Appellant,
v.
BENEFICIAL SAVINGS BANK, F.S.B., Appellee.
No. 87-1921, 87-1922.

April 14, 1988.

Mortgagee moved for appointment of receivers in
two mortgage foreclosure actions. The Circuit Court,
Orange County, Cecil H. Brown, J., granted
mortgagee's motions, and mortgagor appealed. On
consolidated appeal, the District Court of Appeal,
Cobb, J., held that: (1) evidence would not support
appointment of receivers, as there was no showing of
waste as to mortgaged properties, testimony showed
that value of properties was in excess of mortgage
debts owed, and record did not contain reference to
provision in mortgages for appointment of receivers,
and (2) appointment of receivers could not be
justified by statute raised for first time in appellate
answer brief.

Reversed.

West Headnotes

[1] Mortgages 266 ⚖570

266 Mortgages
    266X Foreclosure by Action
        266X(P) Review
            266k570 k. Decisions Reviewable. Most
Cited Cases
Mortgagor's nonfinal appeal from orders appointing
receivers in mortgage foreclosure actions that
provided for rental payments to be made directly to
mortgagee fell within literal scope of appellate rule
providing for review of nonfinal orders which
determine right to immediate possession of property,
but harm imposed on mortgagor was not the type to
require immediate interlocutory appeal, since the

only property possessed was in form of money.
West's F.S.A. R.App.P.Rule 9.130(a)(3)(C)(ii).

[2] Mortgages 266 ⚖469

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k469 k. Proceedings. Most Cited
Cases
Burden is on mortgagor to show property is sufficient
to pay debt and charges due mortgagee, not on
mortgagee to show that property is not sufficient to
cover debt, in determining whether receiver should
be appointed with respect to mortgage for which
rents and profits were expressly made part of security
when mortgagor is receiving rents and profits but
refusing to apply them to mortgage debt, which he is
allowing to go in default.

[3] Mortgages 266 ⚖467(2)

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k467 In General
                    266k467(2) k. Discretion of Court.
Most Cited Cases
Appointment of receiver for mortgaged property
constitutes abuse of discretion absent showing that
mortgaged property is being wasted or otherwise
subject to serious risk of loss.

[4] Mortgages 266 ⚖468(1)

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k468 Grounds
                    266k468(1) k. In General. Most
Cited Cases
Mortgagee was not entitled to appointment of
receivers in two mortgage foreclosure actions,
although outstanding taxes were owed and it was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

523 So.2d 747
523 So.2d 747, 13 Fla. L. Weekly 942
(Cite as: 523 So.2d 747)

possible no hazard insurance was obtained for one of the mortgaged properties, and outstanding taxes were owed on the other property; there was no showing of waste as to the mortgaged properties, with mortgagee's officer not even knowing physical condition of either unit, testimony of mortgagee's officer and mortgagor's president showed that value of each property was in excess of mortgage debt owed, and although mortgagee provided for assignment of rents, there was no reference in record to any provision in mortgages for appointment of receiver.

[5] Mortgages 266 ⬅572

266 Mortgages
   266X Foreclosure by Action
      266X(P) Review
         266k572 k. Presentation and Reservation in Lower Court of Grounds of Review. Most Cited Cases

Appointment of receiver in mortgage foreclosure actions could not be justified by application of statute referred to by mortgagee for first time in appellate answer brief, a statute allowing court to require mortgagor to deposit rents in registry of court pending adjudication of mortgagee's rights to rent. West's F.S.A. § 697.07.

*748 Richard H. Wall of Hartley & Wall, Orlando, for appellant.

R. Edward Cooley of Shepherd, McCabe & Cooley, Orlando, for appellee.

COBB, Judge.

The issue in this consolidated appeal is whether the trial court properly granted appellee's, Beneficial Savings Bank's (Beneficial), motion for the appointment of receivers in two mortgage foreclosure actions against appellant, Atco Construction (Atco).

In the first case, No. 87-1921, the facts are as follows: Beneficial filed a complaint in June, 1987, seeking to foreclose on a condominium unit based on its claim that Atco failed to make payments required under the note and mortgage since March, 1987. A total of $27,016 plus interest was claimed in the complaint. Beneficial filed a motion to appoint itself as receiver of the rents of the condominium unit on the grounds that:

*749 Plaintiff would show that Defendants have been receiving the rents on the aforementioned

mortgaged property, and have not been applying the same to their mortgage payments.

The only witness testifying at the hearing on the motion was a Beneficial employee, Linda Norman. Norman testified that the mortgage had been in default since March, 1987; that the 1986 taxes were unpaid; and that to the best of her knowledge the 1985 taxes were paid by Beneficial. Norman also stated that the surrounding condominium units had been subject to vandalism and destruction, although she had no knowledge of the physical condition of the condominium unit at issue. Norman indicated that to her knowledge there was no hazard insurance on the unit, but that she did not know that for a fact. Norman further testified that she did not know if there was a tenant currently in possession of the unit, and that the latest appraisal of the unit showed a value of $38,000, which matched her opinion as to its value. The president of Atco had previously submitted an affidavit valuing the unit at $45,000.

In Case No. 87-1922, Beneficial sought a foreclosure on another condominium in a different project unrelated to No. 87-1921. Beneficial alleged that the sum of $59,076.62, plus interest, was owed, and that no mortgage payment had been made since March, 1987. Beneficial filed a motion to appoint a receiver in this case, contending as in No. 87-1921 that the defendants had been receiving rents on the property and not applying them to the mortgage payments.

At the hearing on the motion, held immediately after the hearing in No. 87-1921 ended, Linda Norman once again was the only witness. She testified that the payments were due on the property since March, 1987; that to the best of her knowledge the 1986 taxes were unpaid; and that Beneficial paid the 1985 taxes. She estimated that the total balance owed to Beneficial was $54,784. Norman stated that the estimated value of the property was between $75,000 and $80,000. She did not know if the insurance was paid on the property. On cross-examination, Norman indicated that she had driven by the property but had not been inside. She said that to her knowledge there had not been any vandalism in the area, and that she was not aware of any deterioration. She estimated that the approximate rental value of the unit was between $800 and $1,000 per month. An affidavit from the president of Atco

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

523 So.2d 747
523 So.2d 747, 13 Fla. L. Weekly 942
(Cite as: 523 So.2d 747)

Page 3

reflected a value on the property of $85,000.

The trial court appointed Beneficial as receiver in each case to "collect all rental payments, and to manage the same, from the real property in Orange County, described as follows: ..." The court further directed that the rents from each property be paid directly to Beneficial pending the conclusion of the case, with the monies collected to be applied to the mortgage indebtedness.

[1] On appeal,[FN1] Atco contends that insufficient evidence was presented to allow for the appointment of a receiver, and that in any event, both mortgages were adequately secured by the property, since the value of each property exceeded the debt owed. Beneficial responds that based on the unpaid taxes and failure to obtain hazard insurance on the property, a receiver was properly appointed in No. 87-1921. Beneficial urges a similar result in No. 87-1922 based on the mortgage default and the delinquent taxes.

> FN1. Atco has taken this nonfinal appeal pursuant to Florida Rule of Appellate Procedure 9.130(a)(3)(C)(ii), which provides for review of nonfinal orders which determine the right to immediate possession of property. See Florida Reinvestment Corporation v. Cypress Savings Association, 509 So.2d 1352 (Fla. 4th DCA 1987); Thunderbird, Ltd. v. Great American Insurance Company, 470 So.2d 2 (Fla. 1st DCA 1985). In both those cases, however, the orders provided for the receiver to take possession of the property and manage it. In the instant case, the orders only provide for the rental payments to be made directly to Beneficial. While falling under a literal reading of the rule, we doubt that the harm imposed on the defendant here is the type which requires an immediate interlocutory appeal, since the only property "possessed" is in the form of money.

*750 In Carolina Portland Cement Company v. Baumgartner, 99 Fla. 987, 128 So. 241 (1930), the Florida Supreme Court held that while the appointment of a receiver rests in the discretion of the trial court, certain guidelines do apply. The court noted that one such guideline is that a receiver should not be appointed "unless there is a strong reason to believe that the party asking for a receiver will recover." 128 So. at 248. The supreme court expressed a second guideline as follows:

> Where the rents and profits are expressly made a part of the security, and the mortgagor is receiving them but refusing to apply them to the mortgage debt, which he is allowing to go in default, thus dissipating a part of the security, while allowing the debt to increase, a court of equity should appoint a receiver unless the mortgagor makes it clear that the real property covered by the mortgage will sell for enough to pay the debt and charges due the mortgagee and thus affords ample and entirely adequate security.

128 So. at 249; see also Colley v. First Federal Savings & Loan Assn. of Panama City, 516 So.2d 344 (Fla. 1st DCA 1987).

[2][3] The burden is on the mortgagor to show the property is sufficient, not on the mortgagee to show that it is not sufficient to cover the debt. Florida Reinvestment Corporation v. Cypress Savings Assn., 509 So.2d 1352 (Fla. 4th DCA 1987). The appointment of a receiver constitutes an abuse of discretion in the absence of a showing that the mortgaged property is being wasted or otherwise subject to serious risk of loss. See Interdevco, Inc. v. Brickellbanc Savings Association, 524 So.2d 1087 (Fla. 3d DCA 1988).

[4] In the instant case, the evidence presented by Beneficial in Case Number 87-1921 only showed that outstanding taxes were owed and that possibly no hazard insurance was obtained for the premises. In Case Number 87-1922, no contention is made that insurance is unavailable. There was no showing in either case of any waste as to the particular unit; in fact, the officer from Beneficial did not even know the physical condition of either unit. Additionally, the testimony of both the Beneficial officer and of Atco's president showed that the value of each property was above the mortgage debt owed. While the mortgages provide for assignment of the rents, there is no reference in the record to any provision in the mortgage for the appointment of a receiver. Indeed, the mortgage and note were not introduced at either hearing, with their appearance in the record being solely as attachments to the initial complaint. See Turtle Lake Associates, Ltd. v. Third Financial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

523 So.2d 747                                                          Page 4
523 So.2d 747, 13 Fla. L. Weekly 942
(Cite as: 523 So.2d 747)

*Services, Inc.*, 518 So.2d 959 (Fla. 1st DCA 1988) (mortgagor seen as failing to carry burden of showing entitlement to receiver where mortgage was not introduced into evidence and only attached to and incorporated into the complaint, with the court determining that the trial court erred in relying on the provisions of those documents). Furthermore, it should be noted that the only argument made in either motion for appointment of a receiver was that rents paid on the premises were not being applied to the mortgage, and this formed the basis for the relief ordered by the trial court. However, no evidence was presented at either hearing as to whether any rents were in fact coming into the premises, with the Beneficial representative testifying that she did not know whether there was a tenant on the premises in case number 87-1921, and not addressing the issue in Case Number 87-1922.

Beneficial's reliance in both cases on *Smith v. State Life Insurance Company*, 114 Fla. 371, 153 So. 842 (1934), is misplaced. In its summary opinion in *Smith*, the court indicated that while the appointment of a receiver was proper based on unpaid taxes for two years, the property involved therein was also in great need of repairs to prevent deterioration. In the instant case, no deterioration of either property has been shown; thus, even assuming the speculative testimony regarding the unpaid taxes is correct, the standard outlined in *Smith* is not present.

[5] Beneficial attempts to justify its appointment as receiver in both cases by raising, *751 for the first time in its answer brief, section 697.07, Florida Statutes (1987), which allows for a court to require the mortgagor to deposit rents in the registry of the court pending adjudication of the mortgagee's rights to the rent.[FN2] Any relief on this basis is improper, since this relief was never sought in the trial court as a basis for the court's retaining the rents. In fact, the statute was not in effect until after the order was entered in this case.

FN2 Section 697.07, Florida Statutes (1987), effective October 1, 1987, provides as follows:

697.07 Assignment of rents.-A mortgage may provide for an assignment of rents. If such assignment is made, such assignment shall be absolute upon the mortgagor's default, becoming operative upon written demand made by the

mortgagee. Upon application by the mortgagee, a court of competent jurisdiction may require the mortgagor to deposit such rents in the registry of the court pending adjudication of the mortgagee's right to the rents, any payments therefrom to be made solely to protect the mortgaged property and meet the mortgagor's lawful obligations in connection with the property. Any undisbursed portion of said rents shall be disbursed in accordance with the court's final judgment or decree.

The trial court ruled improperly in appointing Beneficial as the receiver for the two mortgaged properties, since Beneficial failed to show either a waste of the properties or any impairment of the security. Accordingly, the orders entered below are

REVERSED.

SHARP, C.J., and DAUKSCH, J., concur.
Fla.App. 5 Dist.,1988.
Atco Const. & Development Corp. v. Beneficial Sav. Bank, F.S.B.
523 So.2d 747, 13 Fla. L. Weekly 942

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

509 So.2d 1352                                                                                     Page 1
509 So.2d 1352, 12 Fla. L. Weekly 1772
(Cite as: 509 So.2d 1352)

Florida Reinvestment Corp. v. Cypress Sav. Ass'n
Fla.App. 4 Dist.,1987.

District Court of Appeal of Florida,Fourth District.
FLORIDA REINVESTMENT CORPORATION, a
Florida corporation, Abrahim R. Golshani, and
Rahman Golzar, Appellants,
v.
CYPRESS SAVINGS ASSOCIATION, a Florida
Savings Association and Sears, Roebuck and
Company, Appellees.
No. 4-86-2503.

July 22, 1987.

Debtor appealed from order of the Circuit Court,
Palm Beach County, John D. Wessel, J., which
appointed receiver for property which was collateral
for loan in foreclosure action. The District Court of
Appeal, Glickstein, J., held that (1) order was
appealable as a nonfinal order determining the right
to immediate possession of property; (2) debtor had
burden to offer proof that the value of the property
loan could cover the entire debt or else to provide
additional security; and (3) creditor made adequate
showing for appointment of receiver.

Affirmed.

Stone, J., filed a specially concurring opinion.

Dell, J., dissented and filed an opinion in which Letts,
J., joined.

West Headnotes

[1] Appeal and Error 30 71(4)

30 Appeal and Error
    30III Decisions Reviewable
        30III(D) Finality of Determination
            30k67 Interlocutory and Intermediate
Decisions
                30k71 Affecting Provisional Remedies
                    30k71(4) k. Receiver. Most Cited
Cases

Appeal from order appointing receiver for property in
foreclosure action was an appealable nonfinal order
determining the right to immediate possession of
property. West's F.S.A. R.App.P.Rule
9.130(a)(3)(C)(ii).

[2] Mortgages 266 469

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k469 k. Proceedings. Most Cited
Cases
Burden was on debtor to offer evidence that the value
of property could alone cover the entire debt at issue
in foreclosure action or to offer additional security in
order to preclude appointment of receiver.

[3] Mortgages 266 467(1)

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k467 In General
                    266k467(1) k. In General. Most
Cited Cases
Debtor may not argue that there should be no receiver
appointed for property in foreclosure proceeding if
the debtor is collecting rents and profits but not
applying them to the debt, unless the debtor shows
that the value of the property securing the debt covers
the entire debt or provides additional security to
account for the rents and profits.

[4] Mortgages 266 467(3)

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k467 In General
                    266k467(3) k. Provisions for
Receiver in Mortgage. Most Cited Cases

Mortgages 266 468(1)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

509 So.2d 1352
509 So.2d 1352, 12 Fla. L. Weekly 1772
(Cite as: 509 So.2d 1352)

Page 2

266 Mortgages
  266X Foreclosure by Action
    266X(I) Receiver
      266k466 Appointment of Receiver
        266k468 Grounds
          266k468(1) k. In General. Most
Cited Cases
Creditor made adequate showing for appointment of
receiver by showing that debtor had defaulted on
mortgage debt, that there were agreed-upon
provisions for appointment of receiver and for
assignment of rents and profits in event of default on
the mortgage, and there was income from rents and
sales contracts not being applied to the debt or the
property.

*1352 Stephen L. Cook, West Palm Beach, for
appellants.

Lawrence M. Kasen of Geiger, Riggs & Freud, P.A.,
Miami, for appellees.

EN BANC

GLICKSTEIN, Judge.

[1] Appellant/defendant appeals an order of the
Palm Beach County Circuit Court, in a foreclosure
action. The order granted plaintiff's motion to appoint
a receiver for the property which was collateral for a
loan from appellee/plaintiff to defendant and for the
rents and profits thereon, and appointed the receiver.
We hold this court has jurisdiction pursuant to
Florida Rule of Appellate Procedure
9.130(a)(3)(C)(ii), which provides for review of non-
final orders that determine the right to immediate
possession of property. Further, we recede from
*1353 State ex rel. Guterma v. Douglas, 463 So.2d
538 (Fla. 4th DCA 1985), which states to the
contrary. Thunderbird, Ltd. v. Great American
Insurance Company, 470 So.2d 2 (Fla. 1st DCA
1985), states an order instructing a receiver to take
immediate possession of property-as the present
order does-is reviewable under the rule mentioned
above. We agree with our companion court.

An older opinion of this court, Mann v. Stein,
379 So.2d 978 (Fla. 4th DCA 1980), stated this court
did not believe the rule applied when the court, as
distinguished from an adverse party, was given
possession of the property. Judge Dauksch, who sat
as an associate judge, dissented from that view. We

believe the dissent was correct.

In our opinion, the owner of the property is
deprived of its possession just as surely when a
receiver takes possession as when an adverse party
does, albeit the property received remains that of the
owner during the receivership. Such conclusion is
implicit in the recent decision in Bowl v. Banc One
Mortgage Corporation, 509 So.2d 966 (Fla. 3d DCA
1987), assuming the question of jurisdiction was
considered.

Appellee, Cypress Savings Association, filed a
mortgage foreclosure action, on seventeen townhouse
units against appellants Florida Reinvestment
Corporation, its guarantors Abrahim R. Golshani and
Rahman Golzar, and Sears, Roebuck & Co. as
possible holder of secured interests in the property.
Subsequently, appellee moved for the appointment of
a receiver on the basis of information and belief that
the units were being rented out to several different
individuals per unit, to the detriment of owners of
other units and risking damage to the properties; and
that the rents were not being used to keep up the
property. Appellee then filed an emergency motion
for appointment of a receiver. This motion stated the
appellant/defendant was receiving rents in violation
of the loan documents, and lack of an early hearing
could redound to plaintiff's prejudice. The court held
a hearing October 6, 1986, and rendered an order
appointing a receiver. Appellant filed its present
notice of appeal. We affirm.

[2] Properly stated, the issue is not, as appellants
would have it, whether the trial court abused its
discretion when it appointed a receiver of the
property owned by appellant when there was no
evidence the property was being subjected to
vandalism, misuse and damages. Such a statement
fails to reflect the correct test for appointing a
receiver for property and rents and profits therefrom
in a mortgage foreclosure case. In the instant case,
although a factor that should be considered
apparently was not-i.e., whether the value of the
property alone could cover the entire debt-the burden
was on the appellant to offer evidence of this or
additional security; and it failed to do so.

The following statement in Carolina Portland
Cement Co. v. Baumgartner, 99 Fla. 987, 128 So. 241
(1930) is pertinent:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Where the rents and profits are expressly made a part of the security, and the mortgagor is receiving them but refusing to apply them to the mortgage debt, which he is allowing to go in default, thus dissipating a part of the security while allowing the debt to increase, a court of equity should appoint a receiver unless the mortgagor makes it clear that the real property covered by the mortgage will sell for enough to pay the debt and charges due the mortgagee and thus affords ample and entirely adequate security. Having voluntarily pledged the rents and profits as part of the security, a mortgagor in default who is misapplying them should not be heard to object to their being impounded by the court pending foreclosure proceedings, regardless of his solvency, unless he satisfies the court that the remaining real estate security is entirely adequate, and that there is no equitable need to disturb the possession accorded him by the statute, or gives security to account for such rents and profits. As to the question of insolvency, he should not be heard to say *1354 that while he has specifically pledged the rents and profits, a receiver should not be appointed because he is solvent and has other property upon which the complainant mortgagee could levy an execution. Having expressly given a lien on the rents and profits of the mortgaged property, he has no right to require the mortgagee to look to other property for the enforcement of the payment of the mortgage debt, while he wastes and destroys the security specifically pledged. He has estopped himself from so doing by his written contract, and will not be heard to object to a receivership unless he first assumes and bears the burden of satisfying the court that the corpus of the estate is ample security to protect the rights of the mortgagee, or gives security approved by the court to properly account for such rents and profits.

*Id.* at 1009-10, 128 So. at 249-50.

[3] To us the above says that while the sufficiency of the property by itself to satisfy the debt is a proper consideration in the trial court's determining whether to appoint a receiver where rents and profits have also been pledged, the burden is on the mortgagor to show the property is sufficient, rather than on the mortgagee to show that it is not sufficient to cover the debt. If we apply the above excerpt to the present circumstances, appellant may not argue that there should be no receiver, if appellant is collecting rents and profits but not

applying them to the debt, unless it either shows the value of the property securing the debt covers the entire debt, or provides security, approved by the court, to account for the rents and profits.

We find no subsequent case law showing any change in the law stated in *Carolina Portland Cement Co.* The law appears to be very much the same today as it was then.

Appellant failed to show that the property alone could sufficiently cover the debt, and did not offer security for the rents and profits. It cannot now come and complain to this court that the appointment of the receiver was based on insufficient facts. Actually, appellant has not discussed the relevant elements, but confined its argument to the risk of property damage and to case law largely less than relevant to the present case.

[4] As to the principles from *Polycoat Corporation v. City National Bank of Miami, 327 So.2d 126 (Fla. 4th DCA 1976)*, which arguably apply here, appellee made adequate allegations, and its motion for appointment of a receiver was supported by business documents and a certain amount of testimony-some of it by appellant's officers. Furthermore, appellee, Cypress Savings Association, made an adequate showing that appellant Florida Reinvestment had defaulted on a mortgage debt; that there were agreed upon provisions for appointment of a receiver and for assignment of rents and profits in the event of default on the mortgage; and that there was income from rents and sales contracts that was not being applied to the debt or the property. Appellant did not attempt to show what was necessary to prevent the appointment of a receiver.

HERSEY, C.J., and DOWNEY, ANSTEAD, WALDEN and GUNTHER, JJ., concur.

STONE, J., concurs specially with opinion.

DELL, J., dissents with opinion.

LETTS, J., concurs with dissent.STONE, Judge, concurring specially.

I concur in the majority opinion, but write separately to point out that even if the appellant had offered evidence of the adequate value of the property, it would only be one of many potential equitable factors to be considered. A trial judge has broad discretion to grant a motion for appointment of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

509 So.2d 1352
509 So.2d 1352, 12 Fla. L. Weekly 1772
(Cite as: 509 So.2d 1352)

Page 4

a receiver where there is a provision for doing so in the mortgage, particularly where there is also a collateral assignment. *1355 *Carolina Portland Cement Co. v. Baumgartner*, 99 Fla. 987, 128 So. 241 (1930). Before a trial court exercises its discretion adverse to the mortgagee in such circumstances, and where there is a likelihood that a default has occurred, the mortgagor must also show a lack of equitable need for the relief requested that will disturb the legal possession of the mortgagor. *Carolina Portland Cement Co.*, 128 So.2d at 250.

DELL, Judge, dissenting.

I respectfully dissent because this court does not have jurisdiction to consider this non-final appeal pursuant to *Florida Rule of Appellate Procedure 9.130(a)(3)(C)(ii)*. In *Mann v. Stein*, 379 So.2d 978 (Fla. 4th DCA 1980) we held:

The review of non-final orders of lower tribunals is severely limited by the terms of *Rule 9.130, Florida Rules of Appellate Procedure*. The language of the rule specifically includes an order granting, continuing, modifying or dissolving an injunction; it does not specifically refer to the appointment of or the refusal to appoint a receiver. Further, the rule provides relief where the issue is the right to immediate possession of property. We think this refers to possession by a party with an adverse interest and not to possession by the court. It would have been a simple matter to make the appointment of or the refusal to appoint a receiver a basis for review of a non-final order. This was not done, and we are of the opinion that it was intentional. Accordingly, we decline to take jurisdiction.

Based on this court's decision in *Mann*, this non-final appeal should be dismissed.

Fla.App. 4 Dist.,1987.
Florida Reinvestment Corp. v. Cypress Sav. Ass'n
509 So.2d 1352, 12 Fla. L. Weekly 1772

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## Westlaw.

157 So. 491
117 Fla. 222, 157 So. 491
(Cite as: 117 Fla. 222, 157 So. 491)

Page 1

**SMITH v. DU PUIS**
Fla. 1934

Supreme Court of Florida.
SMITH
v.
DU PUIS et ux.
Nov. 13, 1934.
Rehearing Denied Nov. 28, 1934.

En Banc.

Suit by M. A. Smith, as liquidator of the Bank of Bay Biscayne, against J. G. DuPuis, also described and known as John G. DuPuis, and wife. From an order denying application for appointment of receiver, the complainant appeals.

Cause remanded with directions.

West Headnotes

[1] Mortgages 266 ☞467(3)

266 Mortgages
   266X Foreclosure by Action
      265X(I) Receiver
         266k466 Appointment of Receiver
            266k467 In General
               266k467(3) k. Provisions for Receiver in Mortgage. Most Cited Cases
Where mortgage authorized appointment of receiver without reference to adequacy of security or mortgagor's solvency and where mortgagor defaulted and did not respect mortgage lien on net profits, mortgagee *held* entitled to proper relief regardless of adequacy of security or solvency of mortgagor, F.S.A. § 63.28.

[2] Mortgages 266 ☞469

266 Mortgages
   266X Foreclosure by Action
      266X(I) Receiver
         266k466 Appointment of Receiver
            266k469 k. Proceedings. Most Cited Cases
Where mortgagor had not mismanaged property and could probably operate it more successfully than any one else, equity would not on mortgagee's application for appointment of receiver, allow property to be taken from mortgagor's management.

[3] Mortgages 266 ☞469

266 Mortgages
   266X Foreclosure by Action
      266X(I) Receiver
         266k466 Appointment of Receiver
            266k469 k. Proceedings. Most Cited Cases
Where peculiar character of property entitled mortgagor who was not guilty of mismanagement nor waste to retain possession thereof but mortgagee's rights demanded that net profits pending foreclosure should be impounded for application on mortgage debt, proper procedure was to appoint mortgagor as receiver requiring him to account for net profits or to require mortgagor to make report to court and deposit net profits in registry of court pending final decree. F.S.A. § 63.28.

*222 **491 Appeal from Circuit Court, Dade County; Worth W. Trammell, Judge.
John M. Murrell, of Miami, for appellant.
*223 T. E. Price, Carl T. Hoffman, and Mitchell D. Price & Charles W. Zaring, all of Miami, for appellees.
BUFORD, Justice.
Appellant filed bill of complaint to foreclose a mortgage of which he alleged that he was the owner and holder as liquidator of the Bank of Bay Biscayne, a banking corporation organized and existing under the laws of the state of Florida, and which had gone into liquidation under the laws of this state.

The mortgage was dated the 15th day of March, 1931, and was to secure the payment of the sum of $88,000 with interest at 7 per cent. per annum from date, as follows:

'Twenty-two thousand dollars ($22,000.00) on account of the principal of said indebtedness on or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

157 So. 491
117 Fla. 222, 157 So. 491
(Cite as: 117 Fla. 222, 157 So. 491)

Page 2

before March 15th, 1932;

'Sixty-one hundred and sixty dollars ($6,160.00) on March 15th, 1932, being the interest at seven per cent. (7%) to said date;

'Twenty-two thousand dollars ($22,000.00) on account of the principal of said indebtedness on or before March 15th, 1933;

'Forty-six hundred and twenty dollars ($4,620.00) on March 15th, 1933, being the interest at seven per cent. (7%) to said date;

'Twenty-two thousand dollars ($22,000.00) on account of the principal of said indebtedness on or before March 15th, 1934;

'Three thousand and eighty dollars ($3,080.00) on March 15th, 1934, being the interest at seven per cent. (7%) to said date;

'Twenty-two thousand dollars ($22,000.00) on account of the principal of said indebtedness on or before March 15th, 1935;

*224 'Fifteen hundred and forty dollars ($1,540.00) on March 15th, 1935, being the interest at seven per cent. (7%) to said date.'

The mortgage pledged certain described real estate and personal property, together with the rents, issues, and profits thereof, and, in addition thereto, contained the following stipulations;

'It is further covenanted and agreed by said parties that in the event of a suit being instituted to foreclose this mortgage, the mortgagee, its successors, legal representatives or assigns shall be entitled to apply at any time pending such foreclosure suit to the court having jurisdiction thereof for the appointment of a receiver of all and singular the mortgaged property, and of all the rents, incomes, profits, issues and revenues thereof, from whatsoever source derived; and thereupon it is hereby expressly covenanted and agreed that the court shall forthwith appoint a receiver of said mortgaged property, all and singular, and of such rents, incomes, profits, issues and revenue thereof, from whatsoever source derived; with the usual powers and duties of receivers in like

cases; and such appointment shall be made by such court as a matter of strict right to the mortgagee, its successors, legal representatives or assigns, **492 and without reference to the adequacy or inadequacy of the value of the property hereby mortgaged, or to the solvency or insolvency of the mortgagors, their heirs, legal representatives, successors or assigns, and that such rent, profits, income, issues and revenues shall be applied by such receiver to the payment of the mortgage indebtedness, costs and charges, according to the order of such court.

'That if any of the said installments herein specified due or payable by the terms hereof in liquidation of said note, or any sum or sums of money due or payable by virtue of this instrument, be not promptly and fully paid when the *225 same become severally due and payble, or within thirty days thereafter, without demand or notice, or if each and every the stipulations, covenants, agreements and conditions of the said promissory note, and of this deed, any or either, are not duly and promptly performed, complied with and abided by, the said entire aggregate sum mentioned in this instrument and the said promissory note then remaining unpaid, with interest accrued, shall become due and payable forthwith or thereafter at the option of the Mortgagee, its successors, legal representatives or assigns, as fully and completely as if said aggregate sum and accrued interests were originally stipulated to be paid on such day, anything in the said promissory note, or herein, to the contrary notwithstanding.'

The bill of complaint was sworn to. Amongst other things, it prayed for a receiver to take charge of the property and to preserve the same and that the receiver be authorized to impound the profits derived from the operation of the property pledged in the mortgage after payment of expenses of operating the business and past due taxes, and other necessary expenses for the protection and preservation of the mortgaged property.

It appears from the record that a stipulation was entered into between counsel that the defendant J. G. Dupuis be appointed temporary receiver pending a hearing on the application for receiver. An order was so made appointing the defendant J. G. DuPuis receiver without bond.

The application for receiver afterwards came on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

157 So. 491
117 Fla. 222, 157 So. 491
(Cite as: 117 Fla. 222, 157 So. 491)

Page 3

for hearing. Voluminous testimony was taken after which the court entered an order vacating the former of July 20th appointing J. G. DuPuis temporary receiver and denied the application for appointment of receiver pendente litem.

From this order, appeal was taken.

[1]*226 The record shows that no payment had been made on mortgage debt, either of principal or interest, and that, while the operation of the mortgage property had yielded large income and profits, practically all of such income and profits had been expended in betterment and improvement of the mortgaged property which consisted of a dairy business located on six hundred and odd acres of land, a herd of fine cattle, dairy barns, and milk and ice cream plants.

The record further shows that during the first six months of 1934, the net profits realized from the operation of the mortgaged property was $33,262.40. But the mortgagors did not apply any of this profit, although it was solemnly pledged therefor, either to the payment of interest or of principal on the mortgage debt.

There is a difference between the stipulation which we have under consideration in this case and that which was treated in Carolina Portland Cement Co. v. Baumgartner, 99 Fla. 987, 128 So. 241, 245. In this case it was stipulated, with reference to the appointment of a receiver, as follows: 'And such appointment shall be made by such court as a matter of strict right to the mortgagee, its successors, legal representatives or assigns, and without reference to the adequacy or inadequacy of the value of the property hereby mortgaged, or to the solvency or insolvency of the mortgagors, their heirs, legal representatives, successors or assigns, and that such rents, profits, income issues and revenues shall be applied by the said receiver to the payment of the mortgage indebtedness, costs and charges according to the order of such court.'

In a number of cases referred to in the Baumgartner Case, the stipulation provided for the appointment of receiver without regard to the solvency or insolvency of the mortgagor. In that case this court was definitely committed to the proposition that covenants of this character inserted *227 in a

mortgage are valid. In that case Mr. Justice Brown, speaking for the court, said:

'If, as was held in Pasco v. Gamble [15 Fla. 562], supra, in cases of insolvency and inadequacy of the property as security, the mortgage, though containing no provision on the subject, will be held in equity to constitute a lien upon the rents and profits, as well as upon the land itself, why may not the parties, by the contract, expressly create such a lien upon the rents and profits, which shall attach, and in proper cases be enforced, regardless of the mortgagor's insolvency and in some **493 cases perhaps regardless even of the inadequacy of the property itself as security? We see no reason why the courts should deny the right of a property owner to so create a contract lien upon the rents and profits of his property. It might well become a valuable right when he finds it necessary to borrow money. It is his property, and if he sees fit to incumber it and also its rents, with a lien to secure a debt, we know of no statutory or constitutional provision which prohibits him from so doing. Certainly section 5725, Comp. Gen. Laws, does not prohibit him from mortgaging the rents any more than the land. It was said in Pasco v. Gamble, quoting Chancellor Kent, that while the mortgagee's common-law rights of entry and possession were gone, the mortgage remains as a 'lien by contract.' If the mortgage on the realty is a mere lien by contract, and the pledging of the rents and profits of the realty is also a lien by contract, which may be created in the same instrument, why should not the latter be enforced and protected by the courts as much so as the former? And if waste of the real estate security is in proper cases considered good ground for the court to interpose and by writ of injunction to restrain the mortgagor from committing such waste, why should not the security afforded, under the terms of the contract, by the rents and profits be also protected,*228 by appointing a receiver in proper cases, to prevent such rents from being wasted and dissipated by a mortgagor in default?'

In that opinion also this court quoted with approval from 4 A. L. R. 1405, note, page 1416, in part as follows:

"Assuming such stipulations to be valid, it seems clear that the condition of the mortgagor as to solvency is immaterial, as is held in some of the cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

discussed hereinafter, The rents and profits may be and often are a very valuable part of real estate. The mortgagee may not desire to resort to an execution against the other property of the mortgagor, assuming him to be solvent. At any rate, where the parties have expressly contracted for a lien upon the rents and profits, there seems to be no valid reason for depriving the mortgagee thereof because of the fact that the mortgagor is solvent, and the debt may be collected by execution on other property of the mortgagor. Nor should the conditions that there must be danger of loss, waste, destruction, or serious impairment of the property, sometimes prescribed as conditions precedent to the appointment of a receiver, be regarded as material where there is such a stipulation. The fact that the mortgaged property, exclusive of the rents and profits, is ample security for the debt secured by the mortgage, is of a different character. It is perhaps going too far to treat this fact as immaterial. But the stipulation should certainly relieve the mortgagee of the burden of proving that the property, exclusive of the rents and profits, is insufficient security. Before a receiver should be denied, where there is such a stipulation, the mortgagor should very clearly show that the property, exclusive of the rents and profits, is ample security. Although supported by judicial authority, the theory that a receiver will not be appointed by virtue of such a stipulation alone has many objectionable features. Notwithstanding the above-*229 mentioned judicial authority, it is the opinion of the writer that such a stipulation should entitle the mortgagee to a receiver, unless it is shown or appears in the case that the mortgaged property, exclusive of the rents and profits, is ample security for the debt. Not all judicial authority denies the correctness of this conclusion. In fact, it finds support in many cases. See infra, particularly the Illinois decisions, which quite generally sustain such stipulations, and give them the effect herein contended for.''

Further in this opinion Mr. Justice Brown said:

'While it is our statutory policy to leave the mortgagor in possession until after foreclosure and sale, and equity will enforce this policy until it becomes necessary to subordinate the mortgagee's possession in order to protect the equitable rights of the mortgagee, yet when the mortgage expressly gives a lien upon the rents and profits and consents to the appointment of a receiver upon default, such

stipulation should be accorded considerable weight by the courts, and will in many cases afford good grounds for the appointment of a receiver where without them a receiver might not be appointed.'

And further in the same opinion Mr. Justice Brown said:

'If the security afforded by a lien upon personal property, given in connection with a mortgage upon realty, may be protected from impairment, without a showing of insolvency and inadequacy of consideration, why not the security afforded by rents and profits of mortgaged realty when likewise expressly pledged as part of the security for the mortgaged debt?'

And further he said:

**494 'Of course, the mere fact that the mortgage pledges the rents and profits, and consents in advance to the appointment of a receiver upon default or breach of conditions, does not mean that upon such a showing alone a court of *230 equity should appoint a receiver as a matter of course. Thus, if it were made to appear that, although in default, the mortgagor was exercising reasonably good care and management of the property and applying the receipts from rentals to the payment of the taxes and *the interest on the mortgage debt as far as they would go*, a receiver could do no more, and no equitable ground would exist for interfering with the right of possession, which under the statute the mortgagor retains. But where, as in this case, according to the bill, *the mortgagor is receiving a large amount monthly in rents, yet failing to keep down the interest on the first mortgage*, thus compelling the second mortgagee to pay such interest to prevent foreclosure of the first mortgage, and *also failing to pay the installments falling due on the second mortgage*, which pledged such rents and profits and agreed to the appointment of a receiver on default, *such bill makes out a good case for the appointment of a receiver.* Cross v. Will County Nat'l Bank, 177 Ill. 33, 52 N. E. 322; C. B. Keogh Mfg. Co. v. Whiston (Sup.) 14 N. Y. S. 344; Jones on Mortgages (8th Ed.) § 1937.'(Italics supplied.)

And so it is that while the complainant does not allege that the security is inadequate or that the defendant is insolvent, the bill does show that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendant has violated the pledges contained in the mortgage and has not respected the complainant's lien on the net profits derived from the operation of the business, but has applied those profits to enhance the value of his property. The mortgage was given to secure the payment of a debt in money and the payment of the debt was duly devolved upon the mortgagor. He agreed to pay interest on the money, but he has failed to pay the interest, although the profits which his testimony shows have been derived from the mortgaged property during the first half of 1934 were entirely sufficient to *231 have paid all past due interest and to have reduced materially the principal debt.

[2] The record shows that the mortgaged property is of a peculiar character which could probably be operated and preserved more successfully by the defendant J. G. DuPuis then by any one else, and, therefore, equity would not allow the property to be taken from the management and control of the defendant and placed in the hands of an inexperienced and uninformed person who would be more likely to create waste than to effectuate a profitable operation.

On the other hand, the record shows that the defendant is deliberately withholding from the complainant the net profits derived from the mortgaged property upon which net profits complainant has a valid lien and which lien could only be made effective for the benefit of the complainant by the intervention of an order of court.

The complainant is entitled to have the benefit of his security according to the contract. That is, he is entitled, default in the payment of interest and principal having occurred, to have the net profits derived from the mortgaged property applied to the payment of the debt and the interest thereon. In his bill of complaint he has only prayed for the impounding of these profits.

The record shows that the complainant was perfectly willing for the defendant J. G. DuPuis to remain in possession, control, and management of the property, but under such directions of the court as would result in the impounding of the profits pending the litigation, to the end that the lien of the mortgage might be impressed upon that fund so that it could not be applied elsewhere.

Section 28 of 1931 Chancery Practice Act (Acts 1931, c. 14658) provides that 'every bill of complaint shall be considered to pray for general relief.' Therefore, the chancellor was authorized to grant any relief that accorded with equity and good *232 conscience, as shown by the bill of complaint and the testimony taken in the cause.

[3] The record does not show mismanagement of the property. Neither does it show waste or depreciation due to errors of management. As stated above, the record shows that Dr. DuPuis is probably better qualified than any one else to conduct the business and, therefore, the chancellor was justified in refusing to appoint a receiver with the usual powers incident to receivership, but the rights of the complainant demanded that the net profits derived from the mortgaged property pending this litigation and such net profits as might be in the hands of the mortgagors at the time of the institution of the suit, should be impounded to be applied in the debt in accordance with the provisions of the mortgage contract between the parties. This end may be accomplished either by appointing J. G. DuPuis receiver and requiring him to account for the net profits or by an order requiring the defendants to make stated reports **495 to the court pending this litigation and to deposit the net profits derived from the operation of the mortgaged property in the registry of the court to be impounded there pending final decree. As no relief was granted the complainant in regard to the impounding of the rents, issues, and profits of the mortgaged property in the decree denying the appointment of a general receiver, the order should be modified so as to secure to the complainant this relief and benefit.

The cause is, therefore, remanded with directions that the order appealed from be modified so as to conform to the views herein expressed.

It is further ordered that the costs incident to this appeal shall be taxed in equal proportions against the appellant and the appellee.

So ordered.

*233 DAVIS, C. J., and WHITFIELD, ELLIS, and TERRELL, JJ., concur.
BROWN, J., disqualified.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

157 So. 491
117 Fla. 222, 157 So. 491
(Cite as: 117 Fla. 222, 157 So. 491)

Fla. 1934
Smith v. DuPuis
117 Fla. 222, 157 So. 491

END OF DOCUMENT

Page 6

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

148 So. 585
110 Fla. 55, 148 So. 585
(Cite as: 110 Fla. 55, 148 So. 585)

Page 1

**MARTORANO v. SPICOLA**
Fla. 1933

Supreme Court of Florida, Division A.
MARTORANO et ux.
v.
SPICOLA et al.
May 4, 1933.

Suit by Rosina Spicola, joined by her husband and
next friend, C. G. Spicola, against Cosmo Martorano
and wife. From an order denying a motion to vacate
the appointment of a receiver appointed without
notice, defendants appeal.

Reversed and remanded, with directions.

West Headnotes

[1] Mortgages 266 ⟜467(3)

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k467 In General
                    266k467(3) k. Provisions for
Receiver in Mortgage. Most Cited Cases
Provisions in mortgage pledging rents and profits and
authorizing receiver's appointment on default, though
not controlling on courts, should be accorded due
weight.

[2] Mortgages 266 ⟜468(3)

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k468 Grounds
                    266k468(3) k. Inadequacy of
Security in Connection with Other Circumstances.
Most Cited Cases
Though mortgage does not expressly pledge rents and
profits, receiver thereof may be appointed where
defaulting mortgagor is insolvent and security
inadequate.

[3] Receivers 323 ⟜35(1)

323 Receivers
    323II Appointment, Qualification, and Tenure
        323k35 Notice of Application
            323k35(1) k. Necessity. Most Cited Cases
Bill seeking receiver's appointment without notice
should particularly set forth facts (Circuit Court
Rules 46, 47).

[4] Mortgages 266 ⟜469

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k469 k. Proceedings. Most Cited
Cases
Where mortgage covered land and dwelling house
actually occupied by mortgagors, appointing receiver
without notice to take possession and collect rents
*held* error notwithstanding mortgage pledged rents
and profits and authorized receiver's appointment
without notice (Circuit Court Rules 46, 47).

[5] Mortgages 266 ⟜191

266 Mortgages
    266IV Rights and Liabilities of Parties
        266k187 Possession or Control of Property
            266k191 k. After Default. Most Cited
Cases
Law contemplates that mortgagor of dwelling house
be allowed to continue occupancy thereof until after
confirmation of foreclosure sale.

*56 **585 Appeal from Circuit Court, Hillsborough
County; F. M. Robles, judge.
John De Marco, of Tampa, for appellants.
Joseph G. Spicola, of Tampa, for appellees.
DAVIS, Chief Justice.
    This case is on appeal from an order of the
circuit court denying motion for defendants in a
foreclosure case for vacation of an order appointing a
receiver for the mortgaged property without notice
and without a substantial showing of necessity.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

therefor. We have considered this appeal in consonance with an original prohibition proceeding filed by defendants in connection with the supersedeas allowed herein. See State el rel. Martorano v. Robles, Circuit Judge (Fla.) 147 So. 910, decided at the present term.

The bill of complaint showed that the mortgaged property consisted entirely of real estate upon which was situate a dwelling house occupied by the mortgagors. The mortgage sued on contained a provision reading as follows: 'It is mutually covenanted and agreed that the party of the second part upon the breach of any of the covenants of this mortgage shall have the right upon the institution of foreclosure proceedings without notice to secure the appointment of a receiver for the said premises and the rents, issues and profits thereof to be held by the said receiver for the payment of the indebtedness secured hereby and for any other purposes as may be ordered by the Court in such proceedings.'

The bill of complaint, after alleging a breach of the mortgage as to payment of taxes and assessments and of installments due on the mortgage debt, set up the fact that the defendant Cosmo Martorano and his wife were insolvent and *57 unable to respond to any deficiency judgment that might be entered; that the mortgaged property would not bring enough money when sold to pay the mortgage indebtedness and costs, and that it was necessary that a receiver be appointed with full power to assume possession of the mortgaged dwelling house occupied by defendants, to rent the same, or to collect rent thereon from the defendants as occupants. The court without notice appointed a receiver and directed him to take possession of the described land immediately, and collect rents therefrom, whether same be occupied by the defendant Cosmo Martorano and his wife or others, and to rent the same when vacancy occurs. Defendants filed motion to set aside said receivership **586 order on the ground that no authority had been shown authorizing the court to make such an order upon the ex parte application of complainants, especially since the property as described in the mortgage was not the property occupied by defendants, although the mortgage was intended to cover such property and reformation was prayed for in the bill to adjudge that it had such effect. The motion was denied, and it is from the latter order that this appeal is taken.

[1][2] When a mortgage pledges the rents and profits and consents to the appointment of a receiver upon default, such provisions, while not controlling upon the courts, should be accorded due weight, and may in many cases authorize the appointment of a receiver where without them the application will be denied. And even where the mortgage contains no express pledge of the rents and profits, the possession of the mortgagor may be subordinated to the equitable rights of the mortgagee and a receiver of the rents and profits appointed, where the mortgagor is in default and is insolvent and the security inadequate. Carolina Portland Cement Company v. Baumgartner, 99 Fla. 987, 128 So. 241; *58 Cong-Otwell-Wilson Corp. v. Commodore's Point Terminal Company, 94 Fla. 448, 114 So. 232; McEwen v. Growers' Loan & Guaranty Co. (Fla.) 139 So. 805.

[3] But this court is committed to the rule that a bill asking the appointment of a receiver without notice to the party whose rights are to be affected, should set forth with particularity the facts and circumstances relied on to justify an ex parte exercise of this extraordinary power. Fricker v. Peters & Calhoun Co., 21 Fla. 254.

Rules 46 and 47 of the Rules Governing Circuit Courts in Chancery proceedings expressly provide that in all cases of applications for the appointment of receivers, the judge to whom presented, before granting same, shall be satisfied that sufficient notice of the application has been given to the party whose property is sought to be adversely affected, and no order for the appointment of a receiver shall be granted without such notice, unless it is manifest to such judge, from the sworn allegations of the bill, or affidavit of the complainant or other competent person, that the injury apprehended will be done if the immediate remedy of a receivership is not afforded. This court has held that it is error to appoint a receiver without such notice as is required by circuit court rules 46 and 47, unless upon the conditions expressly provided for in such rules. Jones v. Rakestraw, 59 Fla. 537, 51 So. 927; Jacksonville Ferry Co. v. Stockton, 40 Fla. 141, 23 So. 557.

The only injury 'apprehended' in the case now before us was the loss of the rents of the property being foreclosed upon, pending the hearing and disposition of an application for a receiver. The bill

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

148 So. 585
110 Fla. 55, 148 So. 585
(Cite as: 110 Fla. 55, 148 So. 585)

of complaint showed that the property in question was in the city of Tampa and that the defendants themselves were in actual occupancy of a dwelling house located upon the same. No showing was made, nor attempted to be made, in excuse of not giving the notice *59 contemplated by the rules governing applications for receiverships, except that the mortgage being foreclosed gave the mortgagee the right 'upon the institution of foreclosure proceedings without notice to secure the appointment of a receiver.'

[4][5] Conceding arguendo that the stipulation in the mortgage would be sufficient to warrant the appointment of a receiver without notice upon a showing that the mortgaged property had been abandoned, or that it was being wasted or destroyed through the mortgagor's neglect of it, it cannot be said that the stipulation per se authorizes a court of equity in awarding, without compliance with rules 46 and 47, hereinbefore mentioned, what is in effect a writ of possession for the mortgaged property in advance of a decree of foreclosure, by the appointment of a receiver without notice for the purpose of ousting mortgagors from their actual occupancy of a dwelling house on the mortgaged land, when it is not shown that the mortgaged dwelling house would be placed in jeopardy of destruction or irreparable injury result, should notice of the application for appointment of a receiver be given as required by the rules. The policy of our law is to allow the mortgagor of a dwelling house to continue his occupancy of it until after a decree of foreclosure shall have been entered and a sale of the mortgaged property made and confirmed. It should not be lightly presumed that a stipulation for appointment of a receiver without notice is applicable where the property involved is a dwelling house in the actual occupancy of the mortgagors and not being used nor offered for use as rental property. This is especially true where, as in this case, the stipulation is not unambiguously to such effect in terms.

Where mortgaged property is actually occupied by the *60 mortgagors as a home place, the appointment of a receiver to oust the mortgagors from their dwelling house is in practical operation and effect the awarding in advance of a writ of possession for the mortgaged property, and should not be done except after timely notice and hearing, or the showing by complainant of some urgency that

dispenses with the notice under the rules governing applications for appointment of receivers without notice.

In the case now before us, it was shown that the chancellor erred in the appointment **587 of a receiver without notice to take charge of and rent the mortgaged property in the actual occupancy of the mortgators as a dwelling place, solely on the basis of a stipulation in the mortgage to the effect that a receiver might be appointed without notice to collect the rents, issues, and profits of the mortgaged property. Therefore the chancelor should have corrected his error by promptly vacating the receivership order upon defendants' timely motion and application therefor. It follows that the order refusing to vacate the receivership that had been improvidently granted without notice was erroneous and should be reversed. It is so ordered, at the costs of the appellees herein. Upon remand of the cause to the court below the motion for vacation of the receivership order should be granted and further proceedings had in the cause according to equity practice.

Reversed and remanded, with directions at cost of appellees.

ELLIS and TERRELL, JJ., concur.
WHITFIELD, P. J., and BROWN and BUFORD, JJ., concur in the opinion and judgment.
Fla. 1933
Martorano v. Spicola
110 Fla. 55, 148 So. 585

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

518 So.2d 959
518 So.2d 959, 13 Fla. L. Weekly 215
(Cite as: 518 So.2d 959)

Page 1

Turtle Lake Associates, Ltd. v. Third Financial
Services, Inc.
Fla.App. 1 Dist.,1988.

District Court of Appeal of Florida,First District.
TURTLE LAKE ASSOCIATES, LTD., Joseph H.
Harman, II, Allan J. Brock, Ben G. Bowen, III, D.
Gary Hill, and First Equities Associates-BH,
Appellants,
v.
THIRD FINANCIAL SERVICES, INC., Appellee.
No. BS-408.

Jan. 15, 1988.

Mortgagee sued to foreclosure on nonrecourse
mortgages it held on apartment complex. The Circuit
Court, Bay County, Don T. Sirmons, J., granted
mortgagee's motion for appointment of receiver
pending outcome of foreclosure action, directed
receiver to pay net profits from property to
mortgagee, and denied mortgagor's request for
receiver's bond or receivership bond. Mortgagors
appealed. The District Court of Appeal, Zehmer, J.,
held that: (1) mortgage documents that were attached
to and incorporated into mortgagee's complaint, but
which were never formally offered into evidence at
hearing on mortgagee's motion for appointment of
receiver, could not be considered by trial court in
deciding whether mortgagee was entitled to receiver,
and (2) mortgagee was not entitled to appointment of
receiver, absent showing that property was
insufficient to secure a mortgage debt.

Reversed and remanded.

West Headnotes

[1] Mortgages 266 ⚖469

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k469 k. Proceedings. Most Cited
Cases
Mortgage documents that were attached to and

incorporated into mortgagee's complaint, but which
were never formally offered into evidence at hearing
on mortgagee's motion to appoint receiver, could not
be considered by trial court.

[2] Mortgages 266 ⚖468(2)

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k468 Grounds
                    266k468(2) k. Inadequacy of
Security in General. Most Cited Cases
Nonrecourse mortgage was not entitled to
appointment of receiver to manage apartment
complex following mortgagors' default, absent
showing that property was insufficient to secure
amount of mortgages, or that mortgage documents
specifically provided for appointment of receiver.

[3] Mortgages 266 ⚖473

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k473 k. Management and Disposition
of Property and Proceeds by Receiver. Most Cited
Cases
Receiver appointed to manage property pending
outcome of mortgage foreclosure action should not
have been ordered to pay over rents and profits
collected to mortgagors or mortgagee until lawsuit
had been decided.

[4] Mortgages 266 ⚖467(1)

266 Mortgages
    266X Foreclosure by Action
        266X(I) Receiver
            266k466 Appointment of Receiver
                266k467 In General
                    266k467(1) k. In General. Most
Cited Cases
Generally, receivers should be appointed to manage
mortgage property pending outcome of foreclosure
proceeding only upon posting of adequate bond.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 So.2d 959
518 So.2d 959, 13 Fla. L. Weekly 215
(Cite as: 518 So.2d 959)

Page 2

*960 Benjamin W. Redding and Timothy J. Sloan, of Barron, Redding, Hughes, Fite, Bassett & Fensom, Panama City, for appellants.

James W. Valenti, Jr., and Barry L. Anderson, of Mahoney, Adams, Milam, Surface & Grimsley, Jacksonville, for appellee.

ZEHMER, Judge.

Appellants, Turtle Lake Associates, Ltd., Joseph H. Harman, II, Allan J. Brock, Ben G. Bowen, III, D. Gary Hill, and First Equities Associates-BH, appeal from a non-final order appointing a receiver to take possession of their property and directing the receiver to pay the net profits from the property to the appellee, Third Financial Services. Appellants also appeal the trial court's failure to require either a receiver's bond or a receivership bond. Finding error, we reverse.

Third Financial Services brought suit against all appellants seeking, inter alia, to foreclose two mortgages on property known as Turtle Lake Apartments. Partners of Hawaii XXII (Hawaii), the original owners of Turtle Lake Apartments, entered into these two non-recourse mortgages in order to finance their purchase of the property. Turtle Lake Associates acquired the property from Hawaii, and entered into a non-recourse mortgage in favor of Hawaii and subordinate to Hawaii's mortgages with Third Financial.

On December 29, 1986, Third Financial filed a three-count complaint against Hawaii and its general partners, Turtle Lake and its general partners, and Edwin B. Raskin Company (Raskin). At the time Third Financial filed suit, Raskin was managing the apartment complex pursuant to a contract with Turtle Lake. The complaint sought foreclosure of the mortgages, damages, and possession of funds held by Raskin.

On January 26, 1987, Raskin filed a motion in the trial court seeking direction on who should receive the net proceeds from the apartment complex during the litigation. Attached to this motion was an affidavit by John W. Campbell, Jr., Raskin's vice president. The affidavit set forth the average income from Turtle Lake Apartments, the average operating costs, and the average fee Raskin received for managing the complex. A hearing on Raskin's motion was set for January 30. Third Financial alleges that it

learned of this hearing on January 27. On the afternoon of January 28, Third Financial's counsel contacted Turtle Lake's counsel by telephone and advised him that Third Financial would seek the appointment of a receiver during this hearing. Third Financial alleges that it sent Turtle Lake written notice of the hearing on its motion to appoint a receiver; Turtle Lake alleges that it never received this notice.

The hearing on Raskin's motion was not transcribed. Both parties have submitted proposed statements of what transpired at the proceeding. With few exceptions, the parties agree on the facts. At the hearing, Third Financial made an oral motion for the appointment of a receiver. The only evidence presented at the hearing was the affidavit attached to Raskin's original motion, and testimony by Earl Rosser, an officer of Third Financial. Rosser testified about the principal amount of the loan, Turtle Lake's payment history, the amount they were in default, and the amount of late fees due on the loans. The loans themselves, although attached to the complaint, *961 were not placed in evidence during this hearing. Turtle Lake alleges that Rosser did not identify or authenticate the loan documents attached to the complaint. Third Financial alleges that Rosser identified the loan documents, but does not state that they were ever offered in evidence. Turtle Lake offered no evidence, but objected to the appointment of a receiver on the grounds that Third Financial had not requested a receiver in its complaint, had never filed a written motion requesting one, had provided inadequate notice to Turtle Lake that it would request one at this hearing, and had presented insufficient evidence to the court to support the appointment. The two parties did agree that, should a receiver be appointed, Raskin would be acceptable to all parties.

The court appointed Raskin as receiver, and ordered Raskin to pay the net proceeds from Turtle Lake Apartments to Third Financial. The court noted that the appointment of a receiver was specifically provided for in the loan documents, with or without judicial proceedings and with or without prior notice to the mortgagor. The court also reasoned that the appointment of a receiver was within the prayer for general relief in count I of the complaint. The court also stated that, because the complaint had requested immediate possession of the property, Turtle Lake was not prejudiced by a subsequent request for less

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

severe relief. Turtle Lake then moved that both a receivership bond and a receiver's bond be required. The court denied the motion. The court also denied Turtle Lake's motion to stay the receivership upon Turtle Lake's posting a supersedeas bond. The court has subsequently required Third Financial to post a $25,000 receivership bond.

[1][2] Appellants first argue that Third Financial was required to prove either that the mortgage provides for the appointment of a receiver or that the value of the property is not sufficient to secure the amount of the indebtedness and that the mortgagor is insolvent. Appellants contend that appellee failed to prove that the mortgages provide for the appointment of a receiver because it never placed the mortgages in evidence. It has been held that a receiver may be appointed without regard to the sufficiency of the security where the mortgage so provides. *Smith v. Du Puis*, 157 So. 491 (Fla.1934); *Carolina Portland Cement Co. v. Baumgartner*, 128 So. 241 (Fla.1930). Thus resolution of this issue depends on whether the trial court could properly consider the provisions of the mortgages attached to and incorporated into the complaint, but never placed in evidence. Pleadings are not evidence, and since appellants never admitted the authenticity or veracity of the alleged mortgages, the trial court erred in relying on the provisions of documents not in evidence. *See Coca-Cola Bottling Co. v. Clark*, 299 So.2d 78 (Fla. 1st DCA 1974), *cert. dismissed*, 301 So.2d 100 (Fla. 1974). Third Financial presented no evidence showing that the value of the property is insufficient to secure the amount of the mortgages. We thus hold that Third Financial otherwise failed to carry its burden of showing entitlement to a receiver.

[3] Appellants next argue that the trial court erred in ordering the receiver to pay over, on a continuing basis, the rents and profits from the apartment complex. We note that the function of a receiver is to preserve and manage the property which is the subject of the litigation. The appointment of a receiver prevents either side from impairing the value of the property in anticipation of losing the suit. Thus, although a receiver may be ordered to pay expenses incurred to maintain the property, and to collect the net rents and profits therefrom pending the outcome of the litigation, it was error to order him to pay over to one of the parties to the litigation money owed by the other party pursuant to the alleged debt which is the subject of the suit. *See Baumgartner*, 128 So. at 244; *Cone-Orwell-Wilson Corp. v. Commodore's Point Terminal Co.*, 114 So. 232 (Fla.1927).

[4] Appellants next argue that the trial court erred in failing to require either a receiver's bond or a receivership bond. Although the trial court required a receivership*962 bond of $25,000 appellants contend that this amount is inadequate. In *Belk's Department Store of Miami, Inc. v. Scherman*, 117 So.2d 845 (Fla. 3d DCA 1960), the court held that a bond with "good and sufficient surety" should be required on the appointment of a receiver unless exceptional circumstances precluding the need or ability to provide a bond are present in the case. *See also Insurance Management Inc. v. McLeod*, 194 So.2d 16 (Fla. 3d DCA 1966). No exceptional circumstances preventing Third Financial from posting an adequate bond have been alleged here. The court in *Belk* also stated that:

a receiver, especially where his duties will consist of or include handling substantial sums of money, should be required to file a bond, with good and sufficient surety, payable to the State of Florida, in an adequate amount to be fixed by the court, conditioned on the faithful performance of his prescribed duties in that office.

117 So.2d at 848; *see also Edenfield v. Crisp*, 186 So.2d 545 (Fla. 2d DCA 1966). The court clearly erred in not requiring such a bond of Raskin. Should the court choose to appoint a receiver on remand in this case, a receivership bond adequate to indemnify Turtle Lake for any damages it might suffer through the receivership of its property should be required from Third Financial. The receiver should post a bond adequate to cover the damages that will be incurred, if the receiver fails in his duty, by the party who ultimately establishes entitlement to the fund.

REVERSED and REMANDED for further proceedings.

JOANOS and WIGGINTON, JJ., concur.

Fla.App. 1 Dist.,1988.
Turtle Lake Associates, Ltd. v. Third Financial Services, Inc.
518 So.2d 959, 13 Fla. L. Weekly 215

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 So.2d 959
518 So.2d 959, 13 Fla. L. Weekly 215
(Cite as: 518 So.2d 959)

Page 4

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CORUS BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  08 C 3409 |
| v. | ) | |
| | ) | |
| EDUARD de GUARDIOLA, | ) | Hon. Wayne R. Andersen |
| | ) | |
| Defendant. | ) | Magistrate Judge Michael T. Mason |
| | ) | |

## CERTIFICATE OF SERVICE

I, Steven V. Hunter, an attorney, certify that I have this day caused the **Notice of Filing** to be served on counsel for the parties listed below through the court's CM/ECF system which constitutes service under LR 5.9.

> Monica J Mosby
> Monica.Mosby@kattenlaw.com
> Timothy J. Patenode
> timothy.patenode@kattenlaw.com
> Katten Muchin Rosenman LLP
> 525 West Monroe Street
> Chicago, IL 60661
> 312-902-5382
> *Counsel for Corus Bank, N.A.*

Dated:  August 27, 2008

/s/ Steven V. Hunter

QBACTIVE\6458108.1